## FOLLETT *v.* TOWN OF McCORMICK.

No. 486. Argued February 11, 1944.—Decided March 27, 1944.

*Mr. Hayden C. Covington,* with whom *Mr. Grover C. Powell* was on the brief, for appellant.

*Messrs. J. Fred Buzhardt* and *Jeff D. Griffith* for appellee.

*Miss Dorothy Kenyon* filed a brief on behalf of the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Appellant was convicted of violating an ordinance of the town of McCormick, South Carolina which provided: ". . . the following license on business, occupation and professions to be paid by the person or persons carrying on or engaged in such business, occupation or professions within the corporate limits of the Town of McCormick, South Carolina: Agents selling books, per day $1.00, per year $15.00." Appellant is a Jehovah's Witness and has been certified by the Watch Tower Bible & Tract Society as "an ordained minister of Jehovah God to preach the gospel of God's kingdom under Christ Jesus." He is a resident of McCormick, South Carolina, where he went from house to house distributing certain books. He obtained his living from the money received; he had no other source of income. He claimed that he merely offered the books for a "contribution." But there was evidence that he "offered to and did sell the books." Admittedly he had no license from the town and refused to obtain one. He moved for a directed verdict of not guilty at the close of the evidence, claiming that the ordinance restricted freedom of worship in violation of the First Amendment which the Fourteenth Amendment makes applicable to the States. The motion was overruled and appellant was found guilty by the jury in the Mayor's Court. That judgment was affirmed by the Circuit Court of General Sessions for McCormick County and then by the Supreme Court of South Carolina. The case is here on appeal. Judicial Code, § 237 (a), 28 U. S. C. § 344 (a).

The ordinance in this case is in all material respects the same as the ones involved in *Jones* v. *Opelika,* 319

U. S. 103, and *Murdock* v. *Pennsylvania,* 319 U. S. 105. In those cases, the tax imposed was also a license tax— "a flat tax imposed on the exercise of a privilege granted by the Bill of Rights" and therefore an unconstitutional exaction. *Murdock* v. *Pennsylvania, supra,* p. 113. In those cases members of Jehovah's Witnesses had also been found guilty of "peddling" or "selling" literature within the meaning of the local ordinances. But since they were engaged in a "religious" rather than a "commercial" venture, we held that the constitutionality of the ordinances might not be measured by the standards governing the sales of wares and merchandise by hucksters and other merchants. "Freedom of press, freedom of speech, freedom of religion are in a preferred position." *Murdock* v. *Pennsylvania, supra,* p. 115. We emphasized that the "inherent vice and evil" of the flat license tax is that "it restrains in advance those constitutional liberties" and "inevitably tends to suppress their exercise." p. 114.

The Supreme Court of South Carolina recognized those principles but distinguished the present case from the *Murdock* and *Opelika* decisions. It pointed out that the appellant was not an itinerant but was a resident of the town where the canvassing took place, and that the principle of the *Murdock* decision was applicable only to itinerant preachers. It stated, moreover, that appellant earned his living "by the sale of books," that his "occupation was that of selling books and not that of colporteur," that "the sales proven were more commercial than religious." It concluded that the "license was required for the selling of books, not for the spreading of religion." [1]

---

[1] The court also distinguished *State* v. *Meredith,* 197 S. C. 351, 15 S. E. 2d 678, where a license tax statute was construed to be inapplicable to an itinerant minister of Jehovah's Witnesses, the "sale" of literature being "merely collateral to the main purpose in which he was engaged, which was to preach and teach the tenets of his religion." p. 355.

We pointed out in the *Murdock* case that the distinction between "religious" activity and "purely commercial" activity would at times be "vital" in determining the constitutionality of flat license taxes such as these. 319 U. S. p. 110. But we need not determine here by what tests the existence of a "religion" or the "free exercise" thereof in the constitutional sense may be ascertained or measured. For the Supreme Court of South Carolina conceded that "the book in question [2] is a religious book"; and it concluded "without difficulty" that "its publication and distribution come within the words, 'exercise of religion,' as they are used in the Constitution." We must accordingly accept as *bona fide* appellant's assertion that he was "preaching the gospel" by going "from house to house presenting the gospel of the kingdom in printed form." Thus we have quite a different case from that of a merchant who sells books at a stand or on the road.

The question is therefore a narrow one. It is whether a flat license tax as applied to one who earns his livelihood as an evangelist or preacher in his home town is constitutional. It was not clear from the records in the *Opelika* and *Murdock* cases to what extent, if any, the Jehovah's Witnesses there involved were dependent on "sales" or "contributions" for a livelihood. But we did state that an "itinerant evangelist" did not become "a mere book agent by selling the Bible or religious tracts to help defray his expenses or to sustain him." 319 U. S. p. 111. Freedom of religion is not merely reserved for those with a long purse. Preachers of the more orthodox faiths are not engaged in commercial undertakings because they are dependent on their calling for a living.

---

[2] Though appellant distributed more than one tract or book, the only one before the Supreme Court of South Carolina was entitled "Children." As stated by that court, "Tested by the tenets of other forms of the Christian religion with which we are familiar, it is full of heresies. But it purports to offer a plan of salvation of the human soul in life after death . . ."

Whether needy or affluent, they avail themselves of the constitutional privilege of a "free exercise" of their religion when they enter the pulpit to proclaim their faith. The priest or preacher is as fully protected in his function as the parishioners are in their worship. A flat license tax on that constitutional privilege would be as odious as the early "taxes on knowledge" which the framers of the First Amendment sought to outlaw. *Grosjean* v. *American Press Co.,* 297 U. S. 233, 245–248. A preacher has no less a claim to that privilege when he is not an itinerant. We referred to the itinerant nature of the activity in the *Murdock* case merely in emphasis of the prohibitive character of the license tax as so applied. Its unconstitutionality was not dependent on that circumstance. The exaction of a tax as a condition to the exercise of the great liberties guaranteed by the First Amendment is as obnoxious (*Grosjean* v. *American Press Co., supra; Murdock* v. *Pennsylvania, supra*) as the imposition of a censorship or a previous restraint. *Near* v. *Minnesota,* 283 U. S. 697. For, to repeat, "the power to tax the exercise of a privilege is the power to control or suppress its enjoyment." *Murdock* v. *Pennsylvania, supra,* p. 112.

But if this license tax would be invalid as applied to one who preaches the Gospel from the pulpit, the judgment below must be reversed. For we fail to see how such a tax loses its constitutional infirmity when exacted from those who confine themselves to their own village or town and spread their religious beliefs from door to door or on the street. The protection of the First Amendment is not restricted to orthodox religious practices any more than it is to the expression of orthodox economic views. He who makes a profession of evangelism is not in a less preferred position than the casual worker.

This does not mean that religious undertakings must be subsidized. The exemption from a license tax of a preacher who preaches or a parishioner who listens does

not mean that either is free from all financial burdens of government, including taxes on income or property. We said as much in the *Murdock* case. 319 U. S. p. 112. But to say that they, like other citizens, may be subject to general taxation does not mean that they can be required to pay a tax for the exercise of that which the First Amendment has made a high constitutional privilege.

*Reversed.*

MR. JUSTICE REED, concurring:

My views on the constitutionality of ordinances of this type are set out at length in *Jones* v. *Opelika*, 316 U. S. 584, and in a dissent on the rehearing of the same case, 319 U. S. 117. These views remain unchanged but they are not in accord with those announced by the Court.

My understanding of this Court's opinions in *Murdock* v. *Pennsylvania*, 319 U. S. 105, and *Jones* v. *Opelika,* 319 U. S. 103, is that distribution of religious literature in return for money when done as a method of spreading the distributor's religious beliefs is an exercise of religion within the First Amendment and therefore immune from interference by the requirement of a license. These opinions are now the law of the land.

As I see no difference in respect to the exercise of religion between an itinerant distributor and one who remains in one general neighborhood or between one who is active part time and another who is active all of his time, there is no occasion for me to state again views already rejected by a majority of the Court. Consequently, I concur in the conclusion reached in the present case.

MR. JUSTICE MURPHY, concurring:

While I am in complete accord with the opinion of the Court, I desire to add a brief word in light of certain statements made in the dissenting opinion. It is claimed

that the effect of our decision is to subsidize religion. But this is merely a harsh way of saying that to prohibit the taxation of religious activities is to give substance to the constitutional right of religious freedom.

It is suggested that we have opened the door to exemption of wealthy religious institutions, like Trinity Church in New York City, from the payment of taxes on property investments from which support is derived for religious activities. It is also charged that the decision contains startling implications with respect to freedom of speech and the press. I am neither disturbed nor impressed by these allegations. We are not called upon in this case to deal with the taxability of income arising out of extensive holdings of commercial property and business activities related thereto. There is an obvious difference between taxing commercial property and investments undertaken for profit, whatever use is made of the income, and laying a tax directly on an activity that is essentially religious in purpose and character or on an exercise of the privilege of free speech and free publication.

It is wise to remember that the taxing and licensing power is a dangerous and potent weapon which, in the hands of unscrupulous or bigoted men, could be used to suppress freedoms and destroy religion unless it is kept within appropriate bounds.

Separate opinion of MR. JUSTICE ROBERTS, MR. JUSTICE FRANKFURTER, and MR. JUSTICE JACKSON.

The present decision extends the rule announced in *Jones* v. *Opelika*, 319 U. S. 103, and *Murdock* v. *Pennsylvania*, 319 U. S. 105.

The ordinance in question is not, in the words of the First Amendment, a law "prohibiting the free exercise" of religion. At the outset it should be observed that the ordinance is not discriminatory. It lays a tax on the pursuit of occupations by which persons earn their living in

the Town of McCormick. It does not single out persons pursuing any given occupation and exempt others. If it were attacked as a denial of the equal protection of the laws the contention would be frivolous.[1] There is no suggestion that the purpose is other than to raise revenue necessary for the support of government from all who enjoy the service and protection of government, and to adjust the tax laid on the appellant in the light of the aid he derives from such service and protection.

Secondly, the ordinance lays no onerous burden on the occupation of the appellant or any other citizen. The tax in question is wholly unlike that considered in *Grosjean* v. *American Press Co.*, 297 U. S. 233, which had the unmistakable purpose of hitting at one out of many occupations and hitting so hard as to discourage or suppress the pursuit of that calling. The Court there said (p. 250):

"It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press."

What then is the law under attack? It is a revenue measure applying generally to those earning their living in the community. It is a monetary exaction reasonably related to the cost of maintaining society by governmental protection, which alone renders civil liberty attainable.

Follett is not made to pay a tax for the exercise of that which the First Amendment has relieved from taxation. He is made to pay for that for which all others similarly situated must pay—an excise for the occupation of street vending. Follett asks exemption because street vending

---

[1] *Clark* v. *Titusville*, 184 U. S. 329; *Southwestern Oil Co.* v. *Texas*, 217 U. S. 114, 121; *Bradley* v. *Richmond*, 227 U. S. 477.

is, for him, also part of his religion. As a result, Follett will enjoy a subsidy for his religion. He will save the contribution for the cost of government which everyone else will have to pay.

The present decision extends and reaches beyond what was decided in *Murdock* v. *Pennsylvania, supra.* There the community asserted the right to subject transient preachers of religion to taxation; there the court emphasized the "itinerant" aspect of the activities sought to be subjected to the exaction. The emphasis there was upon the casual missionary appearances of Jehovah's Witnesses in the town and the injustice of subjecting them to a general license tax. Here, a citizen of the community, earning his living in the community by a religious activity, claims immunity from contributing to the cost of the government under which he lives. The record shows appellant "testified that he obtained his living from the money received from those with whom he placed books, that he had no other source of income."

Unless the phrase "free exercise," embodied in the First Amendment, means that government must render service free to those who earn their living in a religious calling, no reason is apparent why the appellant, like every other earner in the community, should not contribute his share of the community's common burden of expense. In effect the decision grants not free exercise of religion, in the sense that such exercise shall not be hindered or limited, but, on the other hand, requires that the exercise of religion be subsidized. Trinity Church, owning great property in New York City, devotes the income to religious ends. Must it, therefore, be exempt from paying its fair share of the cost of government's protection of its property?

We cannot ignore what this decision involves. If the First Amendment grants immunity from taxation to the exercise of religion, it must equally grant a similar exemp-

tion to those who speak and to the press. It will not do to say that the Amendment, in the clause relating to religion, is couched in the imperative and, in the clause relating to freedom of speech and of press, is couched in the comparative. The Amendment's prohibitions are equally sweeping.[2] If exactions on the business or occupation of selling cannot be enforced against Jehovah's Witnesses they can no more be enforced against publishers or vendors of books, whether dealing with religion or other matters of information. The decision now rendered must mean that the guarantee of freedom of the press creates an immunity equal to that here upheld as to teaching or preaching religious doctrine. Thus the decision precludes nonoppressive, nondiscriminatory licensing or occupation taxes on publishers, and on news vendors as well, since, without the latter, the dissemination of views would be impossible. This court disavowed any such doctrine with respect to freedom of the press in *Grosjean* v. *American Press Co., supra,* and it is unthinkable that those who publish and distribute for profit newspapers and periodicals should suggest that they are in a class apart, untouchable by taxation upon their enterprises for the support of the government which makes their activities possible.

Not only must the court, if it is to be consistent, accord to dissemination of all opinion, religious or other, the same immunity, but, even in the field of religion alone, the implications of the present decision are startling. Multiple activities by which citizens earn their bread may, with equal propriety, be denominated an exercise of religion as may preaching or selling religious tracts. Certainly this court cannot say that one activity is the exercise of religion and the other is not. The materials for judicial

---

[2] "Congress shall make no law . . . prohibiting the free exercise [of religion]; or abridging the freedom of speech, or of the press . . ."

distinction do not exist. It would be difficult to deny the claims of those who devote their lives to the healing of the sick, to the nursing of the disabled, to the betterment of social and economic conditions, and to a myriad other worthy objects, that their respective callings, albeit they earn their living by pursuing them, are, for them, the exercise of religion. Such a belief, however earnestly and honestly held, does not entitle the believers to be free of contribution to the cost of government, which itself guarantees them the privilege of pursuing their callings without governmental prohibition or interference.

We should affirm the judgment.