[Civ. No. 24154. Third Dist. July 25, 1985.]

ATARI, INC., Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Part II of the opinion is not certified for publication.

COUNSEL

Kadison, Pfaelzer, Woodard, Quinn & Rossi, Richard S. Cohen, Richard K. Simon and Monica Bachner for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Edward P. Hollingshead and Charles C. Kobayashi, Deputy Attorneys General, for Defendant and Appellant.

OPINION

**EVANS, Acting P. J.**—Plaintiff (Atari) brought an action for recovery of sales and use taxes, and was awarded a partial refund. Atari appeals from that portion of the judgment holding it liable for a use tax on the consumption of catalogs used to promote its product. Defendant State Board of Equalization (Board) cross-appeals from that portion of the judgment holding that neither royalties paid by plaintiff to the designer of a pinball machine nor royalties paid for the acquisition of "master tapes" were subject to taxation. Board also contends the trial court erred in refusing to allow one of its witnesses to testify about its administrative practices and policies in applying a certain tax regulation. We shall affirm the judgment.

## CATALOGS

Atari designs, manufactures, and sells coin-operated video and pinball games, and video games designed for home use in conjunction with the purchaser's television set. The Atari 2600 video computer system is designed for home use. The system uses game cartridges, which are purchased separately by the computer owner. During the audit period Atari purchased, under resale certificates, 7,532,065 catalogs from various printers. Each system and cartridge sold contains a catalog in the package. The catalog is entitled "The Atari Video Computer System Catalog . . . . More Games, More Fun." Each page contains a description of a cartridge and the games which can by played with it. The descriptions are written in such a manner as to pique the interest of a consumer in a certain game, sport, or academic challenge.[1] The catalog does not include prices, serial numbers, or information regarding where the cartridges may be purchased.

The catalog is sealed in the cartridge package; the consumer receives it whether he wants it or not. One hundred thousand of the catalogs were distributed separate from the cartridges free of charge to distributors and company representatives, and at the company store. Approximately 542,744 catalogs were destroyed as obsolete.[2]

### PINBALL MACHINE

Stephen Bristow, vice-president of engineering for the Atari Tel Division, testified he drafted a letter of agreement between Atari and one Ron Haliburton, the designer of a "giant" pinball machine. A standard pinball machine has a playing field of 28 inches by 48-60 inches and uses a large ball bearing for the game ball. Haliburton's "Bigfoot" pinball machine had a playing field of 4 feet by 8 feet, and used a billiard ball as the game ball. He built a prototype machine which was not marketable in that form. The machine was attractive to Atari because, despite the large playing field, the Bigfoot "played" the same as a standard size machine.

---

[1] For example, the description of the "Starship[tm]" program states "Beam me up, Captain. [¶] Hurtle through space in the cockpit of a spaceship, steering your way through 17 games and variations. [¶] Line up space vehicles and shoot 'em out of the sky while avoiding asteroids. Or pilot a lunar lander onto the moon. One wrong move and it's curtains. [¶] Starship[tm] (game selections 1 to 9) Chase your opponent's space module through space while avoiding other space vehicles. But it's tricky. He can make his space module invisible at any time. [¶] Warp Drive (game selections 10 and 11) Press the button to speed up to warp drive, avoiding other space vehicles as they slip by you at faster and faster speeds. Your mission is to travel as fast and as far as possible without losing time when you hit a space object. [¶] Lunar Lander (game selections 12 to 17) Pilot a lunar lander onto the surface of the moving moon."

[2] Board contends the correct number of catalogs destroyed was 947,064, calculated by dividing the sum Atari charged to scrap by the estimated cost of each catalog.

The agreement called for Haliburton to provide the prototype machine, flippers, slingshots, ball shooters, and stand-up targets[3] to Atari. Haliburton also agreed to provide no more than 100 hours of consulting services and sketches of the components. In return, Atari was to pay Haliburton a 5 percent royalty on the selling price of the giant machines, and a $10,000 cash advance against the royalties. Haliburton received in excess of $88,000 during the audit period.

Bristow testified his intent in entering into the contract with Haliburton was to purchase the concept of the Bigfoot machine. His only reasons for purchasing the prototype machine were so other Atari management personnel could test play it and for purposes of stress testing. The prototype was helpful but not essential to Atari's development of a large scale machine. Eventually, Atari did manufacture a large scale game called "Hercules." Atari designed its own internal parts for the Hercules machine. Haliburton provided the consulting services and sketches as required.

## MASTER TAPES

In 1978, Atari entered into an agreement with Dorsett Educational Systems for a series of taped "self-taught" lessons. The lessons were recorded on metallic oxide recording tapes on seven-inch reels, identical to the type of recording tape used in cassettes manufactured for home stereo system use. Atari copied the Dorsett tapes onto another tape which became Atari's master tape for purposes of mass reproduction. It was necessary for Atari to develop a computer program which would allow the tapes to be played on Atari computers, as the Dorsett tapes were not compatible with the Atari system in the form in which they were purchased.

The Dorsett tapes were neither video tapes nor computer programs. If the master tape made by Atari was played on a conventional stereo system, the listener would hear the audio portion of the tape and a squealing noise, representing the video portion of the tape. The tapes sold by Dorsett to Atari were the type used by persons in the recording industry.

On January 17, 1980, following an audit, Board notified Atari it had a tax liability calculated to be $204,026.46. Atari filed a petition for redetermination, which was denied in its entirety. After payment of the tax assessment, Atari then filed a claim for refund; that claim was also denied. The underlying action ensued.

---

[3]Flippers, slingshots, ball shooters and stand-up targets are components of a pinball machine.

The trial court found (1) Atari was the consumer of the catalogs and thus subject to a use tax; (2) Atari was entitled to a refund for sales taxes paid on the royalties paid to Haliburton; and (3) the Dorsett tapes were master tapes within the meaning of Revenue and Taxation Code section 6362.5[4] and as such, exempt from taxation.

I

Atari contends the trial court, in upholding the use tax on the catalogs, misapplied the "primary purpose" test set forth in *Kaiser Steel Corp.* v. *State Board of Equalization* (1979) 24 Cal.3d 188, 192 [154 Cal.Rptr. 919, 593 P.2d 864], or in the alternative, erred in finding Atari was not exempt from paying a use tax under regulation 1670, subdivision (c).[5] Board correctly argues Atari is precluded from raising the first argument, as its claim for refund was predicated solely upon regulation 1670, subdivision (c).

In its claim for refund, Atari contended the catalogs were "marketing aids." It stated: "Claimant contends that its purchases of the cartridge catalogs are exempt pursuant to Regulation 1670 (b) [*sic*], which provides that a marketing aid is deemed to be 'sold' if a consideration at least equivalent to 50 percent of the purchase price of the aid is obtained from the customer, either by the making of a separate charge or by increasing the regular sales price of other merchandise sold to the customer and delivered with the marketing aid." In its trial brief, Atari switched gears and argued the catalogs were not marketing aids, and thus regulation 1670, subdivision (c), did not apply, and that furthermore, it purchased the catalogs for the purpose of resale and those purchases were therefore exempt from taxation under section 6007 and regulation 1525, subdivision (b), because they were

---

[4]Unless otherwise specified, all further statutory references are to the Revenue and Taxation Code. All regulatory references are to title 18 of the California Administrative Code.

[5]Regulation 1670, subdivision (c), provides: "Marketing Aids. The tax applies to sales of advertising material, display cases, counter display cards, racks, and other similar marketing aids to persons acquiring such property for use in selling of the aid is obtained from the customer, either by the making of a separate charge or by increasing the regular sales price of other merchandise sold to the customer and delivered with the marketing aid. [¶] Manufacturers or others who provide marketing aids to persons engaged in selling their products without obtaining reimbursement equivalent to 50 percent of the purchase price of the aid are deemed to be the consumers of the property provided. In such case the sales tax applies to the sale to or the use tax applies to the use by the manufacturer or other person purchasing the aid for distribution whether it is delivered directly to the person engaged in selling its products or is delivered to a distributor, wholesaler, or jobber for redelivery to such person with "deal merchandise." Distributors, wholesalers, or jobbers are the retailers of aids which they 'sell' to persons engaged in marketing their products."

not retail sales.[6] In its opening statement at trial, Atari emphatically stated the catalogs were not marketing aids under regulation 1670, subdivision (c), but then went on to argue inconsistently that the catalogs fit within the exemption from use tax provided by that regulation for manufacturers who recoup at least 50 percent of the purchase price of the marketing aid in the sale price to the retailer.

Board objected to Atari's statement of the issues, arguing the scope of the action was limited by the claim for refund, and as Atari had relied only upon regulation 1670, subdivision (c), in the claim for refund, it was barred from arguing the "primary purpose" test of *Kaiser Steel, supra.*[7] Under that test, Atari claimed that its primary purpose in purchasing the catalogs was for resale and not as a marketing aid. The trial court overruled the objection and allowed Atari to go forward on both theories. Board renewed its objection at the close of trial; also, over Board's objection, the trial court took judicial notice of the recommendation prepared by Board for purposes of the petition for redetermination, which was prepared and served prior to the filing of the claim for refund. The court considered that recommendation for the limited purpose of determining the scope of the claim for refund. To that extent the trial court erred.

■ The claim for refund delineates and restricts the issues to be considered in a taxpayer's refund action. (*King* v. *State Bd. of Equalization* (1972) 22 Cal.App.3d 1006, 1015 [99 Cal.Rptr. 902].[8] The trial court and this court are without jurisdiction to consider grounds not set forth in the claim. (*American Alliance Ins. Co.* v. *State Bd. of Equalization* (1982) 134 Cal.App.3d 601, 609 [184 Cal.Rptr. 674, 30 A.L.R.4th 865].) ■ We reject plaintiff's argument that its statement in the claim for refund sets

---

[6]Section 6051 imposes a sales tax on all retail sales.

Section 6007 defines "retail sale" or "sale at retail" as "a sale for any purpose other than resale in the regular course of business in the form of tangible personal property."

Regulation 1525 provides: "Property Use in Manufacturing-General Rules. [¶] (a) Tax applies to the sale of tangible personal property to persons who purchase it for the purpose of use in manufacturing, producing or processing tangible personal property and not for the purpose of physically incorporating it into the manufactured article to be sold. Examples of such property are machinery, tools, furniture, office equipment, and chemicals used as catalysts or otherwise to produce a chemical or physical reaction such as the production of heat or the removal of impurities. [¶] (b) Tax does not apply to sales of tangible personal property to persons who purchase it for the purpose of incorporating it into the manufactured article to be sold, as, for example, any raw material becoming an ingredient or component part of the manufactured article."

[7]The *Kaiser Steel* court explained the primary purpose test this way: "Where there are simultaneous uses but only one or primary purpose for the purchase, the entire unit of material is taxes or not taxed, depending on that purpose: . . ." (24 Cal.3d at p. 195.)

[8]Section 12979 directs that every claim for refund "shall state the specific grounds upon which it is founded." If the Board denies the claim, "the claimant may bring an action against the board *on the grounds set forth in the claim* . . . ." (§ 13103; italics added.)

forth an argument of sale for resale. Although regulation 1670, subdivision (c), is based on section 6007, which excludes a sale for resale from taxation, Atari's statement in the claim was very specific. It asserted only that at least 50 percent of the purchase price of the catalogs was recouped when they were sold to retailers. The claim did not raise the issue set forth in *Kaiser Steel* of what the primary intent of Atari was in purchasing the article or what the primary purpose of the purchase was. (24 Cal.3d at p. 192.) As a consequence, we may consider only those arguments based upon the assertion of regulation 1670, subdivision (c), as a basis for tax relief.

■ The rationale behind the rule of confining a complaint and trial to issues raised in the claim for refund is exhaustion of remedies. (*Duffy* v. *State Bd. of Equalization* (1984) 152 Cal.App.3d 1156, 1163 [199 Cal.Rptr. 886].) Prior to seeking relief from the superior court, a taxpayer must present matters of law and fact to the State Board of Equalization so that the Board may be afforded the opportunity to rectify any mistake in tax collection. (*Barnes* v. *State Bd. of Equalization* (1981) 118 Cal.App.3d 994, 1001 [173 Cal.Rptr. 742].) Such a rule prevents having an overworked court consider issues and remedies available through administrative channels.

■ We reject Atari's assertion that the argument of sale for resale was apparent on the face of the claim for refund and consequently will not consider the issue of sale for resale. The trial court erred in allowing Atari to proceed with that issue which was not delineated by the claim for refund. ■ We turn next to Atari's alternate claim under regulation 1670, subdivision (c).

The trial court made a finding that "In determining whether Atari's purchases of the cartridge catalogs were exempt as 'sale for resale', the Court determined that Atari's 'primary purpose' in purchasing the cartridge catalog was for its own use and benefit, as consumer, in advertising its products." Although that finding does not explicitly address regulation 1670, subdivision (c), it necessarily rejects Atari's contention that the catalogs were sold as marketing aids.

To that end, Atari contends there is no substantial evidence to support the finding the catalogs were advertisements. We disagree. ■ The power of an appellate court begins and ends with the determination of whether there is any substantial evidence, contradicted or uncontradicted, which will support the factual findings. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) ■ An appellate court ordinarily looks only at the evidence supporting the successful party and disregards conflicting evidence. (*Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 97 [178 Cal.Rptr. 831].) ■ We

have read the cartridge catalog, and conclude the trial court's finding that it is an advertisement is supported by the evidence. The introductory page congratulates the purchaser for choosing the Atari product, and informs him or her that Atari offers "a library of the greatest video games ever invented." Thirty-six pages of descriptions of the various cartridges available follow. Each description is enticing, aimed at building excitement. The fact the catalog does not contain information regarding where to purchase the cartridges or their prices is irrelevant; obviously, if the purchaser has bought a cartridge or the computer system, he or she has a good idea of where to purchase another and the general price ranges.

The trial court found the purchaser of the cartridge did not need, want, or purchase the catalog with intent to make use of it. The ultimate purchaser received the catalog in the cartridge or computer package. The consumer purchases the cartridge in order to get the game; he does not purchase the cartridge to obtain the catalog. No doubt he or she may be interested in the contents of the catalog once it is discovered, but this does not fall under the category of information "needed or desired" by the consumer. Regulation 1589, subdivision (c)(1), states, "Price Tags. Tax applies to sales of such items as price tags, shipping tags and *advertising matter* used in connection with the sale of property or *enclosed with the property sold*." (Italics added.) "Circulars containing both advertising material and directions for use of four products of a manufacturer, enclosed in a box containing only one of such products, is clearly advertising as to the other products and as such, is used by the manufacturer and is subject to tax." (State Bd. of Equalization, Business Taxes Law Guide, Sales and Use Tax Annotations, § 195.1720, p. 3093.) The annotation applies directly to the matter at hand; the catalog contained in each cartridge package advertises other available products. It does not contain directions, only descriptions. The catalogs were properly subjected to a use tax. (§ 6201.)[9]

■ Atari also argues the judgment must be reversed because the trial court failed to make a finding on the applicability of regulation 1670, subdivision (c), in its statement of decision. ■ Code of Civil Procedure section 632 requires a party requesting a statement of decision to specify

[9]Section 6244, subdivision (a), governs the situation posed here where Atari purchased the catalogs under a resale certificate but later used the catalogs for advertising. That section provides: "If a purchaser who gives a resale certificate or purchases property for the purpose of reselling it makes any storage or use of the property other than retention, demonstration, or display while holding it for sale in the regular course of business, the storage or use is taxable as of the time the property is first so stored or used."

those controverted issues as to which it is requesting a finding.[10] Failure to request findings on specific issues results in a waiver as to those issues. (*Harvard Investment Co.* v. *Gap Stores, Inc.* (1984) 156 Cal.App.3d 704, 709-710, fn. 3 [202 Cal.Rptr. 891].) ■ Atari did not file a request for a statement of decision. It did file a document specifying the taxability of the catalogues as a controverted issue. However, in that document, Atari raised only the issue of the primary purpose test; it did not mention or request a finding under regulation 1670, subdivision (c). Thus, Atari has waived its right to raise the issue on appeal.[11]

The following contentions of defendant are dealt with in the unpublished part of this opinion (see Cal. Rules of Court, rule 976.1).

## II

### DEFENDANT'S CROSS-APPEAL*

*The Haliburton Transaction*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

The judgment is affirmed. The parties shall bear their own costs.

Sparks, J., and Ryan, J.,† concurred.

A petition for a rehearing was denied August 20, 1985.

---

[10]Code of Civil Procedure section 632 provides, in relevant part: "Upon the request of any party appearing at the trial, made within 10 days after the court announces a tentative decision, or if the trial has lasted less than one day, made prior to submission of the matter for decision, the court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial. The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision. After a party has requested such a statement, any party may make proposals as to the content of the statement of decision."

Section 634 of that code further provides: "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal or upon a motion under Section 657 or 663 that the trial court decided in favor of the prevailing party as to those facts or on that issue."

[11]This footnote and part II of this opinion are not to be published. The balance of the opinion is to be published.

*See footnote, *ante,* page 665.

†Assigned by the Chairperson of the Judicial Council.