# JIMMY SWAGGART MINISTRIES *v.* BOARD OF EQUALIZATION OF CALIFORNIA

No. 88–1374.   Argued October 31, 1989—Decided January 17, 1990

O'CONNOR, J., delivered the opinion for a unanimous Court.

*Michael W. McConnell* argued the cause for appellant. With him on the brief were *Charles R. Ajalat, Edward McGlynn Gaffney, Jr.,* and *Jesse H. Choper.*

*Richard E. Nielsen,* Deputy Attorney General of California, argued the cause for appellee. With him on the brief were *John K. Van de Kamp,* Attorney General, and *Neal J. Gobar,* Deputy Attorney General.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case presents the question whether the Religion Clauses of the First Amendment prohibit a State from imposing a generally applicable sales and use tax on the distribution of religious materials by a religious organization.

---

*Briefs of *amici curiae* urging reversal were filed for the Association for Public Justice by *Bradley P. Jacob;* for the Evangelical Council for Financial Accountability et al. by *Samuel E. Ericsson, Michael J. Woodruff,* and *Forest D. Montgomery;* for the International Society for Krishna Consciousness of California, Inc., by *David M. Liberman, Robert C. Moest,* and *Barry A. Fisher;* for the National Council of Churches of Christ in the U. S. A. by *Douglas Laycock;* and for the National Taxpayers Union by *Gale A. Norton.*

*Steven R. Shapiro* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the National Conference of State Legislatures et al. by *Benna Ruth Solomon* and *Charles Rothfeld;* and for the Watchtower Bible and Tract Society of New York, Inc., by *James M. McCabe* and *Donald T. Ridley.*

## I

California's Sales and Use Tax Law requires retailers to pay a sales tax "[f]or the privilege of selling tangible personal property at retail." Cal. Rev. & Tax. Code Ann. § 6051 (West 1987). A "sale" includes any transfer of title or possession of tangible personal property for consideration. Cal. Rev. & Tax. Code Ann. § 6006(a) (West Supp. 1989).

The use tax, as a complement to the sales tax, reaches out-of-state purchases by residents of the State. It is "imposed on the storage, use, or other consumption in this state of tangible personal property purchased from any retailer," § 6201, at the same rate as the sales tax (6 percent). Although the use tax is imposed on the purchaser, § 6202, it is generally collected by the retailer at the time the sale is made. §§ 6202–6206. Neither the State Constitution nor the State Sales and Use Tax Law exempts religious organizations from the sales and use tax, apart from a limited exemption for the serving of meals by religious organizations, § 6363.5.

During the tax period in question (1974 to 1981), appellant Jimmy Swaggart Ministries was a religious organization incorporated as a Louisiana nonprofit corporation and recognized as such by the Internal Revenue Service pursuant to § 501(c)(3) of the Internal Revenue Code of 1954, as amended, 26 U. S. C. § 501(c)(3) (1982 ed.), and by the California State Controller pursuant to the Inheritance Tax and Gift Tax Laws of the State of California. Appellant's constitution and bylaws provide that it "is called for the purpose of establishing and maintaining an evangelistic outreach for the worship of Almighty God." App. 107. This outreach is to be performed "by all available means, both at home and in foreign lands," and

> "shall specifically include evangelistic crusades; missionary endeavors; radio broadcasting (as owner, broadcaster, and placement agency); television broadcasting (both as owner and broadcaster); and audio production and reproduction of music; audio production and re-

production of preaching; audio production and reproduction of teaching; writing, printing and publishing; and, any and all other individual or mass media methods that presently exist or may be devised in the future to proclaim the good news of Jesus Christ." *Id.*, at 107–108.

From 1974 to 1981, appellant conducted numerous "evangelistic crusades" in auditoriums and arenas across the country in cooperation with local churches. *Id.*, at 61. During this period, appellant held 23 crusades in California—each lasting 1 to 3 days, with one crusade lasting 6 days—for a total of 52 days. *Id.*, at 19–20. At the crusades, appellant conducted religious services that included preaching and singing. Some of these services were recorded for later sale or broadcast. Appellant also sold religious books, tapes, records, and other religious and nonreligious merchandise at the crusades.

Appellant also published a monthly magazine, "The Evangelist," which was sold nationwide by subscription. The magazine contained articles of a religious nature as well as advertisements for appellant's religious books, tapes, and records. The magazine included an order form listing the various items for sale in the particular issue and their unit price, with spaces for purchasers to fill in the quantity desired and the total price. Appellant also offered its items for sale through radio, television, and cable television broadcasts, including broadcasts through local California stations.

In 1980, appellee Board of Equalization of the State of California (Board) informed appellant that religious materials were not exempt from the sales tax and requested appellant to register as a seller to facilitate reporting and payment of the tax. See Cal. Rev. & Tax. Code Ann. §§ 6066–6074 (West 1987 and Supp. 1989) (tax registration requirements). Appellant responded that it was exempt from such taxes under the First Amendment. In 1981, the Board audited appellant and advised appellant that it should register as a seller and report and pay sales tax on all sales made at its

California crusades. The Board also opined that appellant had a sufficient nexus with the State of California to require appellant to collect and report use tax on its mail-order sales to California purchasers.

Based on the Board's review of appellant's records, the parties stipulated "that [appellant] sold for use in California tangible personal property for the period April 1, 1974, through December 31, 1981, measured by payment to [appellant] of $1,702,942.00 for mail order sales from Baton Rouge, Louisiana and $240,560.00 for crusade merchandise sales in California." App. 58. These figures represented the sales and use in California of merchandise with specific religious content — Bibles, Bible study manuals, printed sermons and collections of sermons, audiocassette tapes of sermons, religious books and pamphlets, and religious music in the form of songbooks, tapes, and records. See App. to Juris. Statement B-1 to B-3. Based on the sales figures for appellant's religious materials, the Board notified appellant that it owed sales and use taxes of $118,294.54, plus interest of $36,021.11, and a penalty of $11,829.45, for a total amount due of $166,145.10. App. 8. Appellant did not contest the Board's assessment of tax liability for the sale and use of certain nonreligious merchandise, including such items as "T-shirts with JSM logo, mugs, bowls, plates, replicas of crown of thorns, ark of the covenant, Roman coin, candlesticks, Bible stand, pen and pencil sets, prints of religious scenes, bud vase, and communion cups." *Id.*, at 59–60.

Appellant filed a petition for redetermination with the Board, reiterating its view that the tax on religious materials violated the First Amendment. Following a hearing and an appeal to the Board, the Board deleted the penalty but otherwise redetermined the matter without adjustment in the amount of $118,294.54 in taxes owing, plus $65,043.55 in interest. Pursuant to state procedural law, appellant paid the amount and filed a petition for redetermination and refund with the Board. See Cal. Rev. & Tax. Code Ann. §6902

(West 1987). The Board denied appellant's petition, and appellant brought suit in state court, seeking a refund of the tax paid.

The trial court entered judgment for the Board, ruling that appellant was not entitled to a refund of any tax. The California Court of Appeal affirmed, 204 Cal. App. 3d 1269, 250 Cal. Rptr. 891 (1988), and the California Supreme Court denied discretionary review. We noted probable jurisdiction pursuant to 28 U. S. C. § 1257(2) (1982 ed.) (amended in 1988), 490 U. S. 1018 (1989), and now affirm.

## II

Appellant's central contention is that the State's imposition of sales and use tax liability on its sale of religious materials contravenes the First Amendment's command, made applicable to the States by the Fourteenth Amendment, to "make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Appellant challenges the Sales and Use Tax Law under both the Free Exercise and Establishment Clauses.

## A

The Free Exercise Clause, we have noted, "withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority." *Abington School Dist.* v. *Schempp*, 374 U. S. 203, 222–223 (1963). Indeed, "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Wisconsin* v. *Yoder*, 406 U. S. 205, 220 (1972). Our cases have established that "[t]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the

burden." *Hernandez* v. *Commissioner*, 490 U. S. 680, 699 (1989) (citations omitted).

Appellant relies almost exclusively on our decisions in *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943), and *Follett* v. *McCormick*, 321 U. S. 573, 576 (1944), for the proposition that a State may not impose a sales or use tax on the evangelical distribution of religious material by a religious organization. Appellant contends that the State's imposition of use and sales tax liability on it burdens its evangelical distribution of religious materials in a manner identical to the manner in which the evangelists in *Murdock* and *Follett* were burdened.

We reject appellant's expansive reading of *Murdock* and *Follett* as contrary to the decisions themselves. In *Murdock*, we considered the constitutionality of a city ordinance requiring all persons canvassing or soliciting within the city to procure a license by paying a flat fee. Reversing the convictions of Jehovah's Witnesses convicted under the ordinance of soliciting and distributing religious literature without a license, we explained:

> "The hand distribution of religious tracts is an age-old form of missionary evangelism . . . [and] has been a potent force in various religious movements down through the years. This form of evangelism is utilized today on a large scale by various religious sects whose colporteurs carry the Gospel to thousands upon thousands of homes and seek through personal visitations to win adherents to their faith. It is more than preaching; it is more than distribution of religious literature. It is a combination of both. Its purpose is as evangelical as the revival meeting. This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching in the pulpits." 319 U. S., at 108–109 (footnotes omitted).

Accordingly, we held that "spreading one's religious beliefs or preaching the Gospel through distribution of religious lit-

erature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types." *Id.*, at 110; see also *Jones* v. *Opelika*, 319 U. S. 103 (1943); *Martin* v. *Struthers*, 319 U. S. 141 (1943).

We extended *Murdock* the following Term by invalidating, as applied to "one who earns his livelihood as an evangelist or preacher in his home town," an ordinance (similar to that involved in *Murdock*) that required all booksellers to pay a flat fee to procure a license to sell books. *Follett* v. *McCormick*, 321 U. S., at 576. Reaffirming our observation in *Murdock* that "'the power to tax the exercise of a privilege is the power to control or suppress its enjoyment,'" 321 U. S., at 577 (quoting *Murdock, supra*, at 112), we reasoned that "[t]he protection of the First Amendment is not restricted to orthodox religious practices any more than it is to the expression of orthodox economic views. He who makes a profession of evangelism is not in a less preferred position than the casual worker." 321 U. S., at 577.

Our decisions in these cases, however, resulted from the particular nature of the challenged taxes—flat license taxes that operated as a prior restraint on the exercise of religious liberty. In *Murdock*, for instance, we emphasized that the tax at issue was "a license tax—a flat tax imposed on the exercise of a privilege granted by the Bill of Rights," 319 U. S., at 113, and cautioned that "[w]e do not mean to say that religious groups and the press are free from all financial burdens of government. . . . We have here something quite different, for example, from a tax on the income of one who engages in religious activities or a tax on property used or employed in connection with those activities." *Id.*, at 112 (citing *Grosjean* v. *American Press Co.*, 297 U. S. 233, 250 (1936)); see also 319 U. S., at 115 ("This tax is not a charge for the enjoyment of a privilege or benefit bestowed by the state"). In *Follett*, we reiterated that a preacher is not "free from all financial burdens of government, including taxes on income

or property" and, "like other citizens, may be subject to *general* taxation." 321 U. S., at 578 (emphasis added).

Significantly, we noted in both cases that a primary vice of the ordinances at issue was that they operated as prior restraints of constitutionally protected conduct:

> "In all of these cases [in which license taxes have been invalidated] the issuance of the permit or license is dependent on the payment of a license tax. And the license tax is fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenues. It is not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question. It is in no way apportioned. It is a flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment. Accordingly, *it restrains in advance those constitutional liberties of press and religion and inevitably tends to suppress their exercise.* That is almost uniformly recognized as the inherent vice and evil of this flat license tax." *Murdock, supra,* at 113–114 (emphasis added).

See also *Follett, supra,* at 577 ("The exaction of a tax as a condition to the exercise of the great liberties guaranteed by the First Amendment is as obnoxious as the imposition of a censorship or a previous restraint") (citations omitted). Thus, although *Murdock* and *Follett* establish that appellant's form of religious exercise has "as high a claim to constitutional protection as the more orthodox types," *Murdock, supra,* at 110, those cases are of no further help to appellant. Our concern in *Murdock* and *Follett*—that a flat license tax would act as a *precondition* to the free exercise of religious beliefs—is simply not present where a tax applies to all sales and uses of tangible personal property in the State.

Our reading of *Murdock* and *Follett* is confirmed by our decision in *Minneapolis Star & Tribune Co.* v. *Minnesota Commissioner of Revenue,* 460 U. S. 575 (1983), where we con-

sidered a newspaper's First Amendment challenge to a state use tax on ink and paper products used in the production of periodic publications. In the course of striking down the tax, we rejected the newspaper's suggestion, premised on *Murdock* and *Follett*, that a generally applicable sales tax could not be applied to publications. Construing those cases as involving "a flat tax, unrelated to the receipts or income of the speaker or to the expenses of administering a valid regulatory scheme, as a *condition* of the right to speak," 460 U. S., at 587, n. 9 (emphasis in original), we noted:

> "By imposing the tax as a condition of engaging in protected activity, the defendants in those cases imposed a form of prior restraint on speech, rendering the tax highly susceptible to constitutional challenge. In that regard, the cases cited by Star Tribune do not resemble a generally applicable sales tax. Indeed, our cases have consistently recognized that nondiscriminatory taxes on the receipts or income of newspapers would be permissible." *Ibid.* (citations omitted).

Accord, *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 229 (1987) ("[A] genuinely nondiscriminatory tax on the receipts of newspapers would be constitutionally permissible").

We also note that just last Term a plurality of the Court rejected the precise argument appellant now makes. In *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1 (1989), JUSTICE BRENNAN, writing for three Justices, held that a state sales tax exemption for religious publications violated the Establishment Clause. *Id.*, at 14–21 (plurality opinion). In so concluding, the plurality further held that the Free Exercise Clause did not prevent the State from withdrawing its exemption, noting that "[t]o the extent that our opinions in *Murdock* and *Follett* might be read . . . to suggest that the States and the Federal Government may never tax the sale of religious or other publications, we reject those dicta." *Id.*, at 24. JUSTICE WHITE, concurring in the judgment, con-

cluded that the exemption violated the Free Press Clause because the content of a publication determined its tax-exempt status. *Id.*, at 24–25. JUSTICE BLACKMUN, joined by JUSTICE O'CONNOR, concurred in the plurality's holding that the tax exemption at issue in that case contravened the Establishment Clause, but reserved the question whether "the Free Exercise Clause requires a tax exemption for the sale of religious literature by a religious organization; in other words, defining the ultimate scope of *Follett* and *Murdock* may be left for another day." *Id.*, at 28. In this case, of course, California has not chosen to create a tax exemption for religious materials, and we therefore have no need to revisit the Establishment Clause question presented in *Texas Monthly*.

We do, however, decide the free exercise question left open by JUSTICE BLACKMUN's concurrence in *Texas Monthly* by limiting *Murdock* and *Follett* to apply only where a flat license tax operates as a prior restraint on the free exercise of religious beliefs. As such, *Murdock* and *Follett* plainly do not support appellant's free exercise claim. California's generally applicable sales and use tax is not a flat tax, represents only a small fraction of any retail sale, and applies neutrally to all retail sales of tangible personal property made in California. California imposes its sales and use tax even if the seller or the purchaser is charitable, religious, nonprofit, or state or local governmental in nature. See *Union League Club* v. *Johnson*, 18 Cal. 2d 275, 278, 115 P. 2d 425, 426 (1941); *People* v. *Imperial County*, 76 Cal. App. 2d 572, 576–577, 173 P. 2d 352, 354 (1946); *Bank of America National Trust & Savings Assn.* v. *State Board of Equalization*, 209 Cal. App. 2d 780, 796–797, 26 Cal. Rptr. 348, 357–358 (1962). Thus, the sales and use tax is not a tax on the right to disseminate religious information, ideas, or beliefs *per se;* rather, it is a tax on the privilege of making retail sales of tangible personal property and on the storage, use, or other consumption of tangible personal property in California. For example,

California treats the sale of a Bible by a religious organization just as it would treat the sale of a Bible by a bookstore; as long as both are in-state retail sales of tangible personal property, they are both subject to the tax regardless of the motivation for the sale or the purchase. There is no danger that appellant's religious activity is being singled out for special and burdensome treatment.

Moreover, our concern in *Murdock* and *Follett* that flat license taxes operate as a precondition to the exercise of evangelistic activity is not present in this case, because the registration requirement, see Cal. Rev. & Tax. Code Ann. §§ 6066–6074 (West 1987 and Supp. 1989), and the tax itself do not act as prior restraints—no fee is charged for registering, the tax is due regardless of preregistration, and the tax is not imposed as a precondition of disseminating the message. Thus, unlike the license tax in *Murdock*, which was "in no way apportioned" to the "realized revenues" of the itinerant preachers forced to pay the tax, 319 U. S., at 113–114; see also *Texas Monthly, supra,* at 22, the tax at issue in this case is akin to a generally applicable income or property tax, which *Murdock* and *Follett* specifically state may constitutionally be imposed on religious activity.

In addition to appellant's misplaced reliance on *Murdock* and *Follett*, appellant's free exercise claim is also in significant tension with the Court's decision last Term in *Hernandez* v. *Commissioner*, 490 U. S. 680 (1989), holding that the Government's disallowance of a tax deduction for religious "auditing" and "training" services did not violate the Free Exercise Clause. *Id.*, at 694–700. The Court reasoned that

> "[a]ny burden imposed on auditing or training . . . derives solely from the fact that, as a result of the deduction denial, adherents have less money to gain access to such sessions. This burden is no different from that imposed by any public tax or fee; indeed, the burden imposed by the denial of the 'contribution or gift' deduction

would seem to pale by comparison to the overall federal income tax burden on an adherent." *Id.*, at 699.

There is no evidence in this case that collection and payment of the tax violates appellant's sincere religious beliefs. California's nondiscriminatory Sales and Use Tax Law requires only that appellant collect the tax from its California purchasers and remit the tax money to the State. The only burden on appellant is the claimed reduction in income resulting from the presumably lower demand for appellant's wares (caused by the marginally higher price) and from the costs associated with administering the tax. As the Court made clear in *Hernandez*, however, to the extent that imposition of a generally applicable tax merely decreases the amount of money appellant has to spend on its religious activities, any such burden is not constitutionally significant. See *ibid.; Texas Monthly*, 489 U. S., at 19–20 (plurality opinion); see also *Bob Jones University* v. *United States*, 461 U. S. 574, 603–604 (1983).

Appellant contends that the availability of a deduction (at issue in *Hernandez*) and the imposition of a tax (at issue here) are distinguishable, but in both cases adherents base their claim for an exemption on the argument that an "incrementally larger tax burden interferes with their religious activities." 490 U. S., at 700. It is precisely this argument—rather than one applicable only to deductions—that the Court rejected in *Hernandez*. At bottom, though we do not doubt the economic cost to appellant of complying with a generally applicable sales and use tax, such a tax is no different from other generally applicable laws and regulations—such as health and safety regulations—to which appellant must adhere.

Finally, because appellant's religious beliefs do not forbid payment of the sales and use tax, appellant's reliance on *Sherbert* v. *Verner*, 374 U. S. 398 (1963), and its progeny is misplaced, because in no sense has the State "'condition[ed] receipt of an important benefit upon conduct proscribed by a

religious faith, or . . . denie[d] such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs,'" *Hobbie* v. *Unemployment Appeals Comm'n of Florida*, 480 U. S. 136, 141 (1987) (quoting *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707, 717–718 (1981)). Appellant has never alleged that the mere act of paying the tax, by itself, violates its sincere religious beliefs.

We therefore conclude that the collection and payment of the generally applicable tax in this case imposes no constitutionally significant burden on appellant's religious practices or beliefs. The Free Exercise Clause accordingly does not *require* the State to grant appellant an exemption from its generally applicable sales and use tax. Although it is of course possible to imagine that a more onerous tax rate, even if generally applicable, might effectively choke off an adherent's religious practices, cf. *Murdock, supra,* at 115 (the burden of a flat tax could render itinerant evangelism "crushed and closed out by the sheer weight of the toll or tribute which is exacted town by town"), we face no such situation in this case. Accordingly, we intimate no views as to whether such a generally applicable tax might violate the Free Exercise Clause.

### B

Appellant also contends that application of the sales and use tax to its sale of religious materials violates the Establishment Clause because it fosters "'an excessive government entanglement with religion,'" *Lemon* v. *Kurtzman*, 403 U. S. 602, 613 (1971) (quoting *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 674 (1970)). Appellant alleges, for example, that the present controversy has featured on-site inspections of appellant's evangelistic crusades, lengthy on-site audits, examinations of appellant's books and records, threats of criminal prosecution, and layers of administrative and judicial proceedings.

The Establishment Clause prohibits "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz, supra,* at 668. The "excessive entanglement" prong of the tripartite purpose-effect-entanglement *Lemon* test, see *Lemon,* 403 U. S., at 612–613, requires examination of "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority," *id.,* at 615; see also *Walz,* 397 U. S., at 695 (separate opinion of Harlan, J.) (warning of "programs, whose very nature is apt to entangle the state in details of administration"). Indeed, in *Walz* we held that a tax exemption for "religious organizations for religious properties used solely for religious worship," as part of a general exemption for nonprofit institutions, *id.,* at 666–667, did not violate the Establishment Clause. In upholding the tax exemption, we specifically noted that taxation of religious properties would cause at least as much administrative entanglement between government and religious authorities as did the exemption:

> "Either course, taxation of churches or exemption, occasions some degree of involvement with religion. Elimination of exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of these legal processes.
>
> "Granting tax exemptions to churches necessarily operates to afford an indirect economic benefit and also gives rise to some, but yet a lesser, involvement than taxing them. In analyzing either alternative the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Id.,* at 674–675.

The issue presented, therefore, is whether the imposition of sales and use tax liability in this case on appellant results in "excessive" involvement between appellant and the State and "continuing surveillance leading to an impermissible degree of entanglement."

At the outset, it is undeniable that a generally applicable tax has a secular purpose and neither advances nor inhibits religion, for the very essence of such a tax is that it is neutral and nondiscriminatory on questions of religious belief. Thus, whatever the precise contours of the Establishment Clause, see *County of Allegheny* v. *American Civil Liberties Union of Pittsburgh,* 492 U. S. 573, 589–594 (1989) (tracing evolution of Establishment Clause doctrine); cf. *Bowen* v. *Kendrick,* 487 U. S. 589, 615–618 (1988) (applying but noting criticism of the entanglement prong of the *Lemon* test), its undisputed core values are not even remotely called into question by the generally applicable tax in this case.

Even applying the "excessive entanglement" prong of the *Lemon* test, however, we hold that California's imposition of sales and use tax liability on appellant threatens no excessive entanglement between church and state. First, we note that the evidence of administrative entanglement in this case is thin. Appellant alleges that collection and payment of the sales and use tax impose severe accounting burdens on it. The Court of Appeal, however, expressly found that the record did not support appellant's factual assertions, noting that appellant "had a sophisticated accounting staff and had recently computerized its accounting and that [appellant] in its own books and for purposes of obtaining a federal income tax exemption segregated 'retail sales' and 'donations.'" 204 Cal. App. 3d, at 1289, 250 Cal. Rptr., at 905.

Second, even assuming that the tax imposes substantial administrative burdens on appellant, such administrative and recordkeeping burdens do not rise to a constitutionally significant level. Collection and payment of the tax will of course require some contact between appellant and the State,

but we have held that generally applicable administrative and recordkeeping regulations may be imposed on religious organization without running afoul of the Establishment Clause. See *Hernandez*, 490 U. S., at 696–697 ("[R]outine regulatory interaction [such as application of neutral tax laws] which involves no inquiries into religious doctrine, . . . no delegation of state power to a religious body, . . . and no 'detailed monitoring and close administrative contact' between secular and religious bodies, . . . does not of itself violate the nonentanglement command"); *Tony and Susan Alamo Foundation* v. *Secretary of Labor*, 471 U. S. 290, 305–306 (1985) ("The Establishment Clause does not exempt religious organizations from such secular governmental activity as fire inspections and building and zoning regulations, *Lemon, supra,* at 614, and the recordkeeping requirements of the Fair Labor Standards Act, while perhaps more burdensome in terms of paperwork, are not significantly more intrusive into religious affairs"). To be sure, we noted in *Tony and Susan Alamo Foundation* that the recordkeeping requirements at issue in that case "appl[ied] only to commercial activities undertaken with a 'business purpose,' and would therefore have no impact on petitioners' own evangelical activities," 471 U. S., at 305, but that recognition did not bear on whether the generally applicable regulation was nevertheless "the kind of government surveillance the Court has previously held to pose an intolerable risk of government entanglement with religion," *ibid.*

The fact that appellant must bear the cost of collecting and remitting a generally applicable sales and use tax—even if the financial burden of such costs may vary from religion to religion—does not enmesh government in religious affairs. Contrary to appellant's contentions, the statutory scheme requires neither the involvement of state employees in, nor on-site continuing inspection of, appellant's day-to-day operations. There is no "official and continuing surveillance," *Walz, supra,* at 675, by government auditors. The sorts of

government entanglement that we have found to violate the Establishment Clause have been far more invasive than the level of contact created by the administration of neutral tax laws. Cf. *Aguilar* v. *Felton,* 473 U. S. 402, 414 (1985); *Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116, 126–127 (1982).

Most significantly, the imposition of the sales and use tax without an exemption for appellant does not require the State to inquire into the religious content of the items sold or the religious motivation for selling or purchasing the items, because the materials are subject to the tax regardless of content or motive. From the State's point of view, the critical question is not whether the materials are religious, but whether there is a sale or a use, a question which involves only a secular determination. Thus, this case stands on firmer ground than *Hernandez,* because appellant offers the items at a stated price, thereby relieving the State of the need to place a monetary value on appellant's religious items. Compare *Hernandez,* 490 U. S., at 697–698 (where no comparable good or service is sold in the marketplace, Internal Revenue Service looks to cost of providing the good or service), with *id.,* at 706 (O'CONNOR, J., dissenting) ("It becomes impossible . . . to compute the 'contribution' portion of a payment to charity where what is received in return is not merely an intangible, but an intangible (or, for that matter a tangible) that is not bought and sold except in donative contexts"). Although appellant asserts that donations often accompany payments made for the religious items and that items are sometimes given away without payment (or only nominal payment), it is plain that, in the first case, appellant's use of "order forms" and "price lists" renders illusory any difficulty in separating the two portions and that, in the second case, the question is only whether any particular transfer constitutes a "sale." Ironically, appellant's theory, under which government may not tax "religious core" activities but may tax "nonreligious" activities, would require government to do precisely what appellant asserts the Religion

Clauses prohibit: "determine which expenditures are religious and which are secular." *Lemon*, 403 U. S., at 621–622.

Accordingly, because we find no excessive entanglement between government and religion in this case, we hold that the imposition of sales and use tax liability on appellant does not violate the Establishment Clause.

## III

Appellant also contends that the State's imposition of use tax liability on it violates the Commerce and Due Process Clauses because, as an out-of-state distributor, it had an insufficient "nexus" to the State. See *National Geographic Society* v. *California Bd. of Equalization*, 430 U. S. 551, 554 (1977); *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U. S. 753, 756–760 (1967). We decline to reach the merits of this claim, however, because the courts below ruled that the claim was procedurally barred.

California law provides that an administrative claim for a tax refund "shall state the specific grounds upon which the claim is founded," Cal. Rev. & Tax. Code Ann. § 6904(a) (West Supp. 1989), and that refund suits will be entertained only if "a claim for refund or credit has been duly filed" with the Board, § 6932. Suit may thereafter be brought only "on the grounds set forth in the claim." § 6933. Thus, under state law, "[t]he claim for refund delineates and restricts the issues to be considered in a taxpayer's refund action. The trial court and [appellate] court are without jurisdiction to consider grounds not set forth in the claim." *Atari, Inc.* v. *State Board of Equalization*, 170 Cal. App. 3d 665, 672, 216 Cal. Rptr. 267, 271 (1985) (citations omitted). This rule serves a legitimate state interest in requiring parties to exhaust administrative remedies before proceeding to court, for "[s]uch a rule prevents having an overworked court consider issues and remedies available through administrative channels." *Id.*, at 673, 216 Cal. Rptr., at 272.

The record in this case makes clear that appellant, in its refund claim before the Board, failed even to cite the Commerce Clause or the Due Process Clause, much less articulate legal arguments contesting the nexus issue. See App. 34 (incorporating petition for redetermination, which in turn raised only First Amendment arguments, see *id.*, at 11–16). The Board's hearing officer specifically noted, in forwarding his decision to the Board, that appellant's "[c]ounsel does not argue nexus," *id.*, at 22, and indeed the parties stipulated before the trial court that appellant's request for a refund was based on its First Amendment claim, *id.*, at 59. Accordingly, both the trial court and the Court of Appeal declined to rule on the nexus issue on the ground that appellant had failed to raise it in its refund claim before the Board. 204 Cal. App. 3d, at 1290–1292, 250 Cal. Rptr., at 905–906; App. 213. This unambiguous application of state procedural law makes it unnecessary for us to review the asserted claim. See *Michigan* v. *Long*, 463 U. S. 1032, 1041–1042 (1983); *Michigan* v. *Tyler*, 436 U. S. 499, 512, n. 7 (1978).

Appellant nevertheless urges that the state procedural ground relied upon by the courts below is inadequate because the procedural rule is not "'strictly or regularly followed.'" *Hathorn* v. *Lovorn*, 457 U. S. 255, 263 (1982) (quoting *Barr* v. *City of Columbia*, 378 U. S. 146, 149 (1964)). Appellant asserts that state courts in California retain the authority to hear claims "involving important questions of public policy" notwithstanding the parties' failure to raise those claims before an administrative agency. See *Lindeleaf* v. *Agricultural Labor Relations Bd.*, 41 Cal. 3d 861, 870–871, 718 P. 2d 106, 112 (1986); *Hale* v. *Morgan*, 22 Cal. 3d 388, 394, 584 P. 2d 512, 516 (1978). Appellant observes, for example, that although the Court of Appeal in this case found appellant's nexus claim to be procedurally barred, it ignored the procedural bar and ruled on the merits of appellant's Ninth and Tenth Amendment arguments, see 204 Cal. App. 3d, at 1292–1293, 250 Cal. Rptr., at 907–908, even though those argu-

ments were likewise not raised in appellant's refund claim, see *id.*, at 1292, n. 19, 250 Cal. Rptr., at 907, n. 19.

The Court of Appeal, however, specifically rejected appellant's claim that the nexus issue raised "important questions of public policy," noting that the issue instead "raise[d] factual questions, the determination of which is not a matter of 'public policy' but a matter of evidence." *Id.*, at 1292, 250 Cal. Rptr, at 907. Even if the Court of Appeal erred as a matter of state law in declining to rule on appellant's nexus claim, appellant has failed to substantiate any claim that the California courts in general apply this exception in an irregular, arbitrary, or inconsistent manner. Accordingly, we conclude that appellant's Commerce Clause and Due Process Clause argument is not properly before us. We thus express no opinion on the merits of the claim.

The judgment of the California Court of Appeal is affirmed.

*It is so ordered.*