**BRANCH MINISTRIES and Dan Little, Pastor, Appellants,**

v.

**Charles O. ROSSOTTI, Commissioner, Internal Revenue Service, Appellee.**

No. 99–5097.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 20, 2000.

Decided May 12, 2000.

Mark N. Troobnick, with whom Jay Alan Sekulow and Colby M. May were on the briefs, argued the cause for appellants.

Thomas J. Sawyer, Attorney, U.S. Department of Justice, with whom Loretta C. Argrett, Assistant Attorney General, and Kenneth L. Greene, Attorney, U.S. Department of Justice, and Wilma A. Lewis, United States Attorney, were on the brief, argued the cause for appellee.

Richard P. Hutchison, Mark R. Levin and Janet LaRue were on the brief for amici curiae Landmark Legal Foundation and Family Research Council

Ayesha N. Khan, Elliot M. Mincberg and Alma C. Henderson were on the brief for amici curiae Americans United for Separation of Church and State and People for the American Way Foundation.

Before SILBERMAN and HENDERSON, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the court filed by Senior Judge BUCKLEY.

BUCKLEY, Senior Judge:

Four days before the 1992 presidential election, Branch Ministries, a tax-exempt church, placed full-page advertisements in two newspapers in which it urged Christians not to vote for then-presidential candidate Bill Clinton because of his positions on certain moral issues. The Internal Revenue Service concluded that the placement of the advertisements violated the statutory restrictions on organizations exempt from taxation and, for the first time in its history, it revoked a bona fide church's tax-exempt status because of its involvement in politics. Branch Ministries and its pastor, Dan Little, challenge the revocation on the grounds that (1) the Service acted beyond its statutory authority, (2) the revocation violated its right to the free exercise of religion guaranteed by the First Amendment and the Religious Freedom Restoration Act, and (3) it was the victim of selective prosecution in violation of the Fifth Amendment. Because these objections are without merit, we affirm the district court's grant of summary judgment to the Service.

## I. BACKGROUND

### A. Taxation of Churches

The Internal Revenue Code ("Code") exempts certain organizations from taxation, including those organized and operated for religious purposes, provided that they do not engage in certain activities, including involvement in "any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(a), (c)(3) (1994). Contributions to such organizations are also deductible from the donating taxpayer's taxable income. *Id.* § 170(a). Although most organizations seeking tax-exempt status are required to apply to the Internal Revenue Service ("IRS" or "Service") for an advance determination that they meet the requirements of section 501(c)(3), *id.* § 508(a), a church may simply hold itself out as tax exempt and receive the benefits of that status without applying for advance recognition from the IRS. *Id.* § 508(c)(1)(A).

The IRS maintains a periodically updated "Publication No. 78," in which it lists all organizations that have received a ruling or determination letter confirming the deductibility of contributions made to them. *See* Rev. Proc. 82–39, 1982–1 C.B. 759, §§ 2.01, 2.03. Thus, a listing in that publication will provide donors with advance assurance that their contributions will be deductible under section 170(a). If a listed organization has subsequently had its tax-exempt status revoked, contributions that are made to it by a donor who is unaware of the change in status will generally be treated as deductible if made on or before the date that the revocation is publicly announced. *Id.* § 3.01. Donors to a church that has not received an advance determination of its tax-exempt status may also deduct their contributions; but in the event of an audit, the taxpayer will bear the burden of establishing that the church meets the requirements of section 501(c)(3). *See generally id.* § 3.04; Rev. Proc. 80–24, 1980–1 C.B. 658, § 6 (discussing taxpayers' obligations in seeking a ruling or determination letter).

The unique treatment churches receive in the Internal Revenue Code is further reflected in special restrictions on the IRS's ability to investigate the tax status of a church. The Church Audit Procedures Act ("CAPA") sets out the circumstances under which the IRS may initiate an investigation of a church and the procedures it is required to follow in such an

investigation. 26 U.S.C. § 7611. Upon a "reasonable belief" by a high-level Treasury official that a church may not be exempt from taxation under section 501, the IRS may begin a "church tax inquiry." *Id.* § 7611(a). A church tax inquiry is defined, rather circularly, as

any inquiry to a church (other than an examination) to serve as a basis for determining whether a church—

(A) is exempt from tax under section 501(a) by reason of its status as a church, or

(B) is ... engaged in activities which may be subject to taxation....

*Id.* § 7611(h)(2). If the IRS is not able to resolve its concerns through a church tax inquiry, it may proceed to the second level of investigation: a "church tax examination." In such an examination, the IRS may obtain and review the church's records or examine its activities "to determine whether [the] organization claiming to be a church is a church for any period." *Id.* § 7611(b)(1)(A), (B).

## B. Factual and Procedural History

Branch Ministries, Inc. operates the Church at Pierce Creek ("Church"), a Christian church located in Binghamton, New York. In 1983, the Church requested and received a letter from the IRS recognizing its tax-exempt status. On October 30, 1992, four days before the presidential election, the Church placed full-page advertisements in *USA Today* and the *Washington Times*. Each bore the headline "Christians Beware" and asserted that then-Governor Clinton's positions concerning abortion, homosexuality, and the distribution of condoms to teenagers in schools violated Biblical precepts. The following appeared at the bottom of each advertisement:

This advertisement was co-sponsored by the Church at Pierce Creek, Daniel J. Little, Senior Pastor, and by churches and concerned Christians nationwide. Tax-deductible donations for this advertisement gladly accepted. Make dona-

tions to: The Church at Pierce Creek. [mailing address].

Appendix ("App.") at Tab 5, Ex. E.

The advertisements did not go unnoticed. They produced hundreds of contributions to the Church from across the country and were mentioned in a *New York Times* article and an Anthony Lewis column which stated that the sponsors of the advertisement had almost certainly violated the Internal Revenue Code. Peter Applebome, *Religious Right Intensifies Campaign for Bush*, N.Y. Times, Oct. 31, 1992, at A1; Anthony Lewis, *Tax Exempt Politics?*, N.Y. Times, Dec. 1, 1992, at A15.

The advertisements also came to the attention of the Regional Commissioner of the IRS, who notified the Church on November 20, 1992 that he had authorized a church tax inquiry based on "a reasonable belief ... that you may not be tax-exempt or that you may be liable for tax" due to political activities and expenditures. Letter from Cornelius J. Coleman, IRS Regional Commissioner, to The Church at Pierce Creek (Nov. 20, 1992), *reprinted in* App. at Tab 5, Ex. F. The Church denied that it had engaged in any prohibited political activity and declined to provide the IRS with certain information the Service had requested. On February 11, 1993, the IRS informed the Church that it was beginning a church tax examination. Following two unproductive meetings between the parties, the IRS revoked the Church's section 501(c)(3) tax-exempt status on January 19, 1995, citing the newspaper advertisements as prohibited intervention in a political campaign.

The Church and Pastor Little (collectively, "Church") commenced this lawsuit soon thereafter. This had the effect of suspending the revocation of the Church's tax exemption until the district court entered its judgment in this case. *See* 26 U.S.C. § 7428(c). The Church challenged the revocation of its tax-exempt status, alleging that the IRS had no authority to revoke its tax exemption, that the revoca-

tion violated its right to free speech and to freely exercise its religion under the First Amendment and the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb ("RFRA"), and that the IRS engaged in selective prosecution in violation of the Equal Protection Clause of the Fifth Amendment. After allowing discovery on the Church's selective prosecution claim, *Branch Ministries, Inc. v. Richardson,* 970 F.Supp. 11 (D.D.C.1997), the district court granted summary judgment in favor of the IRS. *Branch Ministries v. Rossotti,* 40 F.Supp.2d 15 (D.D.C.1999).

■ The Church filed a timely appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We review summary judgment decisions *de novo, see Everett v. United States,* 158 F.3d 1364, 1367 (D.C.Cir.1998), *cert. denied,* 526 U.S. 1132, 119 S.Ct. 1807, 143 L.Ed.2d 1010 (1999), and will affirm only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## II. ANALYSIS

The Church advances a number of arguments in support of its challenges to the revocation. We examine only those that warrant analysis.

### A. The Statutory Authority of the IRS

■ The Church argues that, under the Internal Revenue Code, the IRS does not have the statutory authority to revoke the tax-exempt status of a bona fide church. It reasons as follows: section 501(c)(3) refers to tax-exempt status for religious organizations, not churches; section 508, on the other hand, specifically exempts "churches" from the requirement of applying for advance recognition of tax-exempt status, *id.* § 508(c)(1)(A); therefore, according to the Church, its tax-exempt status is derived not from section 501(c)(3), but from the lack of any provision in the Code for the taxation of churches. The Church concludes from this that it is not subject to taxation and that the IRS is

therefore powerless to place conditions upon or to remove its tax-exempt status as a church.

We find this argument more creative than persuasive. The simple answer, of course, is that whereas not every religious organization is a church, every church is a religious organization. More to the point, irrespective of whether it was required to do so, the Church applied to the IRS for an advance determination of its tax-exempt status. The IRS granted that recognition and now seeks to withdraw it. CAPA gives the IRS this power.

That statute, which pertains exclusively to churches, provides authority for revocation of the tax-exempt status of a church through its references to other sections of the Internal Revenue Code. The section of CAPA entitled "Limitations on revocation of tax-exempt status, etc." provides that the Secretary of the Treasury may "determine that an organization is not a church which [ ] (i) is exempt from taxation by reason of section 501(a), or (ii) is described in section 170(c)." 26 U.S.C. § 7611(d)(1)(A)(i), (ii). Both of these sections condition tax-exempt status on non-intervention in political campaigns. Section 501(a) states that "[a]n organization described in subsection (c) ... shall be exempt from taxation...." *Id.* § 501(a). Those described in subsection (c) include

> corporations ... organized and operated exclusively for religious ... purposes ... which do[ ] not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

*Id.* § 501(c)(3). Similarly, section 170(c) allows taxpayers to deduct from their taxable income donations made to a corporation

> organized and operated exclusively for religious ... purposes ... which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to ... intervene in (including the publish-

ing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

*Id.* § 170(c)(2)(B), (D).

The Code, in short, specifically states that organizations that fail to comply with the restrictions set forth in section 501(c) are not qualified to receive the tax exemption that it provides. Having satisfied ourselves that the IRS had the statutory authority to revoke the Church's tax-exempt status, we now turn to the free exercise challenges.

### B. First Amendment Claims and the RFRA

■ The Church claims that the revocation of its exemption violated its right to freely exercise its religion under both the First Amendment and the RFRA. To sustain its claim under either the Constitution or the statute, the Church must first establish that its free exercise right has been substantially burdened. *See Jimmy Swaggart Ministries v. Board of Equalization,* 493 U.S. 378, 384–85, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) ("Our cases have established that the free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden.") (internal quotation marks and brackets omitted); 42 U.S.C. § 2000bb–1(a), (b) ("Government shall not substantially burden a person's exercise of religion" in the absence of a compelling government interest that is furthered by the least restrictive means.). We conclude that the Church has failed to meet this test.

The Church asserts, first, that a revocation would threaten its existence. *See* Affidavit of Dan Little dated July 31, 1995 at ¶ 22, *reprinted in* App. at Tab 8 ("The Church at Pierce Creek will have to close due to the revocation of its tax exempt status, and the inability of congregants to deduct their contributions from their tax-

es."). The Church maintains that a loss of its tax-exempt status will not only make its members reluctant to contribute the funds essential to its survival, but may obligate the Church itself to pay taxes.

■ The Church appears to assume that the withdrawal of a conditional privilege for failure to meet the condition is in itself an unconstitutional burden on its free exercise right. This is true, however, only if the receipt of the privilege (in this case the tax exemption) is conditioned

> upon conduct proscribed by a religious faith, or ... denie[d] ... because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.

*Jimmy Swaggart Ministries,* 493 U.S. at 391–92, 110 S.Ct. 688 (internal quotation marks and citation omitted). Although its advertisements reflected its religious convictions on certain questions of morality, the Church does not maintain that a withdrawal from electoral politics would violate its beliefs. The sole effect of the loss of the tax exemption will be to decrease the amount of money available to the Church for its religious practices. The Supreme Court has declared, however, that such a burden "is not constitutionally significant." *Id.* at 391, 110 S.Ct. 688; *see also Hernandez v. Commissioner,* 490 U.S. 680, 700, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (the "contention that an incrementally larger tax burden interferes with [ ] religious activities ... knows no limitation").

In actual fact, even this burden is overstated. Because of the unique treatment churches receive under the Internal Revenue Code, the impact of the revocation is likely to be more symbolic than substantial. As the IRS confirmed at oral argument, if the Church does not intervene in future political campaigns, it may hold itself out as a 501(c)(3) organization and receive all the benefits of that status. All that will have been lost, in that event, is the advance assurance of deductibility in

the event a donor should be audited. *See* 26 U.S.C. § 508(c)(1)(A); Rev. Proc. 82–39 § 2.03. Contributions will remain tax deductible as long as donors are able to establish that the Church meets the requirements of section 501(c)(3).

Nor does the revocation necessarily make the Church liable for the payment of taxes. As the IRS explicitly represented in its brief and reiterated at oral argument, the revocation of the exemption does not convert bona fide donations into income taxable to the Church. *See* 26 U.S.C. § 102 ("Gross income does not include the value of property acquired by gift. . . ."). Furthermore, we know of no authority, and counsel provided none, to prevent the Church from reapplying for a prospective determination of its tax-exempt status and regaining the advance assurance of deductibility—provided, of course, that it renounces future involvement in political campaigns.

We also reject the Church's argument that it is substantially burdened because it has no alternate means by which to communicate its sentiments about candidates for public office. In *Regan v. Taxation With Representation*, 461 U.S. 540, 552–53, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (Blackmun, J., concurring), three members of the Supreme Court stated that the availability of such an alternate means of communication is essential to the constitutionality of section 501(c)(3)'s restrictions on lobbying. The Court subsequently confirmed that this was an accurate description of its holding. *See FCC v. League of Women Voters*, 468 U.S. 364, 400, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). In *Regan*, the concurring justices noted that "TWR may use its present § 501(c)(3) organization for its nonlobbying activities and may create a § 501(c)(4) affiliate to pursue its charitable goals through lobbying." 461 U.S. at 552, 103 S.Ct. 1997.

█ The Church has such an avenue available to it. As was the case with TWR, the Church may form a related organization under section 501(c)(4) of the Code. *See* 26 U.S.C. § 501(c)(4) (tax exemption for "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare"). Such organizations are exempt from taxation; but unlike their section 501(c)(3) counterparts, · contributions to them are not deductible. *See id.* § 170(c); *see also Regan*, 461 U.S. at 543, 552–53, 103 S.Ct. 1997. Although a section 501(c)(4) organization is also subject to the ban on intervening in political campaigns, *see* 26 C.F.R. § 1.501(c)(4)–1(a)(2)(ii) (1999), it may form a political action committee ("PAC") that would be free to participate in political campaigns. *Id.* § 1.527–6(f), (g) ("[A]n organization described in section 501(c) that is exempt from taxation under section 501(a) may, [if it is not a section 501(c)(3) organization], establish and maintain such a separate segregated fund to receive contributions and make expenditures in a political campaign.").

At oral argument, counsel for the Church doggedly maintained that there can be no "Church at Pierce Creek PAC." True, it may not itself create a PAC; but as we have pointed out, the Church can initiate a series of steps that will provide an alternate means of political communication that will satisfy the standards set by the concurring justices in *Regan*. Should the Church proceed to do so, however, it must understand that the related 501(c)(4) organization must be separately incorporated; and it must maintain records that will demonstrate that tax-deductible contributions to the Church have not been used to support the political activities conducted by the 501(c)(4) organization's political action arm. *See* 26 U.S.C. § 527(f)(3); 26 C.F.R. § 1.527–6(e), (f).

That the Church cannot use its tax-free dollars to fund such a PAC unquestionably passes constitutional muster. The Supreme Court has consistently held that, absent invidious discrimination, "Congress has not violated [an organization's] First Amendment rights by declining to subsi-

dize its First Amendment activities." *Regan*, 461 U.S. at 548, 103 S.Ct. 1997; *see also Cammarano v. United States*, 358 U.S. 498, 513, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959) ("Petitioners are not being denied a tax deduction because they engage in constitutionally protected activities, but are simply being required to pay for those activities entirely out of their own pockets, as everyone else engaging in similar activities is required to do under the provisions of the Internal Revenue Code.").

Because the Church has failed to demonstrate that its free exercise rights have been substantially burdened, we do not reach its arguments that section 501(c)(3) does not serve a compelling government interest or, if it is indeed compelling, that revocation of its tax exemption was not the least restrictive means of furthering that interest.

■ Nor does the Church succeed in its claim that the IRS has violated its First Amendment free speech rights by engaging in viewpoint discrimination. The restrictions imposed by section 501(c)(3) are viewpoint neutral; they prohibit intervention in favor of all candidates for public office by all tax-exempt organizations, regardless of candidate, party, or viewpoint. *Cf. Regan*, 461 U.S. at 550–51, 103 S.Ct. 1997 (upholding denial of tax deduction for lobbying activities, in spite of allowance of such deduction for veteran's groups).

C. Selective Prosecution (Fifth Amendment)

The Church alleges that the IRS violated the Equal Protection Clause of the Fifth Amendment by engaging in selective prosecution. In support of its claim, the Church has submitted several hundred pages of newspaper excerpts reporting political campaign activities in, or by the pastors of, other churches that have retained their tax-exempt status. These include reports of explicit endorsements of Democratic candidates by clergymen as well as many instances in which favored candidates have been invited to address congregations from the pulpit. The Church complains that despite this widespread and widely reported involvement by other churches in political campaigns, it is the only one to have ever had its tax-exempt status revoked for engaging in political activity. It attributes this alleged discrimination to the Service's political bias.

■ To establish selective prosecution, the Church must "prove that (1) [it] was singled out for prosecution from among others similarly situated and (2) that [the] prosecution was improperly motivated, i.e., based on race, religion or another arbitrary classification." *United States v. Washington*, 705 F.2d 489, 494 (D.C.Cir.1983). This burden is a demanding one because "in the absence of clear evidence to the contrary, courts presume that [government prosecutors] have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (internal quotation marks and citation omitted).

■ At oral argument, counsel for the IRS conceded that if some of the church-sponsored political activities cited by the Church were accurately reported, they were in violation of section 501(c)(3) and could have resulted in the revocation of those churches' tax-exempt status. But even if the Service could have revoked their tax exemptions, the Church has failed to establish selective prosecution because it has failed to demonstrate that it was similarly situated to any of those other churches. None of the reported activities involved the placement of advertisements in newspapers with nationwide circulations opposing a candidate and soliciting tax deductible contributions to defray their cost. As we have stated,

[i]f . . . there was no one to whom defendant could be compared in order to resolve the question of [prosecutorial] selection, then it follows that defendant has failed to make out one of the ele-

ments of its case. Discrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances.

*Attorney Gen. v. Irish People, Inc.,* 684 F.2d 928, 946 (D.C.Cir.1982); *see also United States v. Hastings,* 126 F.3d 310, 315 (4th Cir.1997) ("[D]efendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.") (internal quotation marks and citation omitted).

Because the Church has failed to establish that it was singled out for prosecution from among others who were similarly situated, we need not examine whether the IRS was improperly motivated in undertaking this prosecution.

### III. CONCLUSION

For the foregoing reasons, we find that the revocation of the Church's tax-exempt status neither violated the Constitution nor exceeded the IRS's statutory authority. The judgment of the district court is therefore

*Affirmed.*