# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 11, 2024          Decided June 21, 2024

No. 23-5122

IOWASKA CHURCH OF HEALING,
APPELLANT

v.

DANIEL I. WERFEL, IN HIS OFFICIAL CAPACITY AS
COMMISSIONER, INTERNAL REVENUE SERVICE AND UNITED
STATES OF AMERICA,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-02475)

———

*Simon A. Steel* argued the cause for appellant. With him on the briefs was *William A. Boatwright*.

*Matthew C. Zorn* and *David J. Gutierrez* were on the brief for *amici curiae* the Chacruna Institute for Psychedelic Plant Medicines and Sacred Plant Alliance in support of appellant.

*Kathleen E. Lyon*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was *Jacob Earl Christensen*, Attorney.

Before: HENDERSON and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Appellant Iowaska Church of Healing (the "Church") is an organization whose members' sincerely-held religious belief involves the consumption of Ayahuasca—a tea that contains the hallucinogenic drug dimethyltryptamine ("DMT"), which is a drug that is regulated by the federal government under the Controlled Substances Act ("CSA"). *See* 21 U.S.C. §§ 811(a), 812 Schedule I(c)(5). The Church sued Appellees the Commissioner of the Internal Revenue Service ("IRS") and the United States (together, the "Government") in the District Court to challenge the IRS's denial of its application for tax-exempt status under 26 U.S.C. § 501(c)(3). On cross-motions for summary judgment, the District Court denied the Church's motion and granted the Government's motion. The Church now appeals the District Court's decision.

The Church argues, first, that the District Court erred in affirming the IRS's determination because it was based on an incorrect assumption that the Church's religious Ayahuasca use was illegal. Second, the Church contends that the District Court further erred in holding that the Church lacks Article III standing to assert a Religious Freedom Restoration Act of 1993 ("RFRA") claim against the Government for impermissibly burdening the Church's free exercise of religion by denying its tax-exemption application. The District Court did not, however, err on either front. As the District Court held, the Church lacks standing to assert its RFRA claim. That lack of standing, in turn, dooms its tax-exemption claim; without a *prima facie* showing on its RFRA claim, we have no occasion to question the IRS's decisions to deny the Church's

application for tax-exempt status and to refuse the Church's demand that the agency assess whether the Church's proposed Ayahuasca use warrants a religious exemption from the CSA—an assessment that the IRS has no authority to entertain. Accordingly, we affirm the District Court's judgment as to the Church's tax-exemption claim and dismiss the Church's RFRA claim without prejudice for lack of standing.

## I.

### A.

Under Section 501(c)(3) of the Internal Revenue Code, certain entities "organized and operated exclusively for religious, charitable, . . . or educational purposes" may be exempt from federal taxation, provided that "no part of the net earnings of [the entity] inures to the benefit of any private shareholder or individual," "no substantial part" of the organization's "activities" involves the attempt "to influence legislation," and the organization "does not participate in" any "political campaign[.]" 26 U.S.C. § 501(c)(3); *see id.* § 501(a). "[A]n organization must be both organized and operated for one or more of the purposes specified" in Section 501(c)(3) to qualify for tax-exempt status under that section. 26 C.F.R. § 1.501(c)(3)-1(a)(1); *see id.* § 1.501(c)(3)-1(d)(1)(i). "If an organization fails to meet either the organizational test or the operational test," however, "it is not exempt." *Id.* § 1.501(c)(3)-1(a)(1).

IRS regulations clarify the requirements of the organizational and operational tests. To survive the "organizational" test, the organization's articles of organization must "limit" the organization's purposes to exempt purposes and may "not expressly empower the organization to engage . . . in activities which in themselves

are not in furtherance of one or more exempt purposes." *Id.* § 1.501(c)(3)-1(b)(1)(i)(a)–(b). More specifically, "[a]n organization is not organized exclusively for one or more exempt purposes if its articles expressly empower it to carry on, otherwise than as an insubstantial part of its activities, activities which are not in furtherance of one or more exempt purposes." *Id.* § 1.501(c)(3)-1(b)(1)(iii). To pass the "operational" test, the organization must separately be "engage[d] primarily in activities which accomplish one or more . . . exempt purposes" and will fail that test "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." *Id.* § 1.501(c)(3)-1(c)(1). Importantly, an organization may be denied tax-exempt status if its purposes or activities are illegal or otherwise contrary to public policy. *Bob Jones Univ. v. United States*, 461 U.S. 574, 591 (1983); Rev. Rul. 71-447, 1971-2 C.B. 230 ("All charitable trusts, educational or otherwise, are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy"); *see also* IRS, PUB. NO. 1828, TAX GUIDE FOR CHURCHES & RELIGIOUS ORGANIZATIONS 33 (2015) (explaining that the IRS "makes no attempt to evaluate the content of whatever doctrine a particular organization claims is religious, provided the particular beliefs of the organization are truly and sincerely held" and "the practices and rites associated with the organization's belief or creed are not illegal or contrary to clearly defined public policy.").

A charitable religious organization's use of a controlled substance such as DMT, the possession and distribution of which is generally illegal under the CSA, *see* 21 U.S.C. §§ 812 Schedule I(c)(6), 841(a), 844(a), may obtain an exemption for such use in one of two ways—from the Drug Enforcement Agency ("DEA") or a federal court. The CSA authorizes the Attorney General to "waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it

consistent with the public health and safety." 21 U.S.C. § 822(d). The Attorney General has delegated the authority to grant CSA waivers or exemptions to the DEA. *See* 21 C.F.R. § 1307.03. Pursuant to that delegated authority, the DEA issued guidance in 2009 ("2009 Guidance") for "[p]arties requesting religious exemptions from" the CSA. DEA, No. EO-DEA007, GUIDANCE REGARDING PETITIONS FOR RELIGIOUS EXEMPTION FROM THE CONTROLLED SUBSTANCES ACT PURSUANT TO THE RELIGIOUS FREEDOM RESTORATION ACT 1 (Nov. 20, 2020). The 2009 Guidance directs applicants to provide information detailing the applicant's planned use of a controlled substance, together with information showing that barring of the applicant's use of that substance would "(1) be a substantial burden on (2) his/her sincere (3) religious exercise." *Id.* Further, the 2009 Guidance provides that "[n]o petitioner may engage in any activity prohibited under the [CSA] or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration." *Id.* at 2.

Separately, a federal court may issue a CSA exemption. Under RFRA, the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless "it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). The statute's coverage is expansive—RFRA explicitly protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *id.* § 2000cc-5(7)(A); *see id.* § 2000bb-2(4), "applies to all Federal law, and the implementation of that law, whether statutory or otherwise,'" *id.* § 2000bb-3(a), and defines the term "government" to include "a branch, department, agency, instrumentality, and official (or other

person acting under color of law) of the United States, or of a covered entity," *id.* § 2000bb-2(1). To effectuate RFRA's protections, Congress has authorized federal courts to provide relief where a person's religious exercise has been burdened by the government in violation of the statute. 42 U.S.C. § 2000bb-1(c) (providing that "[a] person whose religious exercise has been burdened in violation of [the Act] may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government"). Affirming RFRA's application in this context, the Supreme Court has held that "it is the obligation of courts to consider whether [CSA] exceptions are required under the [RFRA] test set forth by Congress." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 434 (2006).

Pursuant to RFRA, a plaintiff must, as an initial matter, "establish that its free exercise right has been substantially burdened." *Branch Ministries v. Rossotti*, 211 F.3d 137, 142 (D.C. Cir. 2000) (citing *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 384–85 (1990)). Only if a litigant can establish that their exercise of religion has been substantially burdened does the burden shift to the government to show that the burden is "in furtherance of a compelling governmental interest" and is the "least restrictive means" of doing so. 42 U.S.C. § 2000bb-1(b); *see Singh v. Berger*, 56 F.4th 88, 97 (D.C. Cir. 2022).

**B.**

The Church is an organization and religious corporation whose members' sincerely-held religious belief involves the consumption of Ayahuasca, which contains DMT. In January 2019, the Church filed an application with the IRS for designation as a federally tax-exempt organization under

Section 501(c)(3).[1]  One month later, the Church also applied to the DEA for a religious exemption from the CSA to authorize its Ayahuasca use.  In that application, the Church acknowledged that DMT "is illegal absent the appropriate registration with the DEA or pursuant to a judicial or other registration exemption" from the CSA.  J.A. 247.  The Church represents that the DEA, to date, has yet to issue a determination.

The Church's purpose and mission revolve primarily around the consumption of Ayahuasca and embracing certain spiritual benefits that the Church's members believe follow from Ayahuasca consumption.  The Church's articles of incorporation define its mission as "inspir[ing] individuals to seek and embrace authentic, self-realized healing of the mind, body and spirit through the use of the sacred, indigenous plant-medicine of Ayahuasca."  J.A. 236.  The articles additionally list several other purposes and activities, which notably include "offer[ing] the public access to spiritual growth, development and healing through the sacred Sacrament of Ayahuasca" and "provid[ing] necessary information to all participants of sacred

---

[1] The Church also applied for designation as a church under 26 U.S.C. § 170(b)(1)(A)(i), which would permit individuals to categorize contributions to the Church as tax-deductible charitable contributions.  26 U.S.C. §§ 170(a)(1), (b)(1)(A)(1).  The IRS determined that the Church did not qualify as a church for lack of an "associational role," given that the Church's members "reside in various states and countries," often "do not come to weekend . . . ceremonies on a regular basis," and "do not return for weeks, months, or . . . at all."  J.A. 331.  Although the Church also challenged the IRS's rejection of its Section 170 application in its complaint, the District Court declined to reach the issue and so the Church does not raise it on appeal.  *See Iowaska Church of Healing v. United States* ("*Iowaska I*"), 2023 WL 2733774 at *5, n.6 (citing 26 U.S.C. § 509(a)).

healing ceremonies involving the consumption of Ayahuasca." J.A. 208. Pursuant to its primary mission, and despite a so-called "savings clause" in the articles that promises the Church "shall not carry on any other activities not permitted" by a Section 501(c)(3) organization, J.A. 211, the Church distributed Ayahuasca in multiple ceremonies between May and July 2019—while its IRS and DEA applications were pending—before voluntarily suspending its ceremonies.

Before issuing a determination, the IRS sent the Church several follow-up questions regarding its application. In June 2019, the IRS sought information regarding "the status of [the Church's] religious exemption application with the DEA[.]" J.A. 271. The Church timely responded that it had been informed by the DEA that the CSA application was "still in progress." J.A. 281. In September 2019, the IRS asked the Church for, *inter alia*, its plans for operation if the DEA were to deny the Church's application for a CSA exemption, an explanation of how the Ayahuasca ceremonies in 2019 were legal without a CSA exemption, and information on whether any of the Church's members do not regularly participate in the Ayahuasca ceremonies. The Church replied that its Ayahuasca ceremonies in 2019 were "protected under federal law" because of the Supreme Court's recognition in *O Centro* that "sacramental use of Ayahuasca as a sincere exercise of religion under the First Amendment." *Id.* at 293–94. On the Church's read, *O Centro* made clear that "it is not necessary for a church to first apply for and secure a religious exemption from the [CSA] before enforcing its religious freedom rights in the courts." J.A. 294. The Church further related that, if the CSA exemption were to be denied, it would seek judicial relief under RFRA. Notably, the Church neither represented that any of its members forgo Ayahuasca ceremonies nor described how it would operate if it were denied CSA exemption by both the DEA and a court.

In February 2020, the IRS again requested more information, asking, as relevant here, whether the Church had received guidance for applying for a CSA exemption from the DEA or the Department of Justice ("DOJ"); how the Church could be in compliance with the part of the 2009 Guidance that directly prohibits petitioners with pending applications from "engag[ing] in an activity prohibited under the [CSA] or its regulations unless" the petition has been granted, *id.* at 315; and whether the Church had sought relief in the courts to "enforc[e] [the Church's] religious freedom rights" since it had not secured the exemption, *id.* at 312. The Church answered that it had not received any DEA or DOJ guidance, that the 2009 Guidance "d[id] not carry the force of law," *id.* at 317, that the Supreme Court's holding in *O Centro* trumps the 2009 Guidance, and that the Church had not sought relief in any court because it did not believe that doing so was necessary since its actions were already protected by the First Amendment and RFRA, *id.* at 320.

Unpersuaded by the Church's responses, the IRS issued a proposed adverse determination in June 2020. The IRS explained that the Church failed the organizational test, both because it was formed in part for the illegal purpose of distributing a substance containing DMT and because "[m]ore than an insubstantial part of [the Church's] activities" were "not in furtherance of an exempt purpose," but instead "serve[d] a substantial nonexempt purpose" in that they primarily involved "advocating and engaging in activities that contravene federal law" and "enabling individuals to engage in an activity illegal under federal law[.]" J.A. 331. The IRS also rejected the Church's defense that its activities are protected by RFRA following *O Centro*. The agency concluded that, in *O Centro*, the Supreme Court held only that "an organization does not have to apply for . . . exemption [from the DEA] prior to seeking relief in the courts," not that applicants can "simply use

[Ayahuasca] without the exemption." *Id.* at 333. The Church quickly filed to protest the IRS's proposed adverse determination, but the IRS, unmoved by the Church's challenge, issued a final adverse determination ("IRS Decision") in June 2021 affirming its earlier proposed determination.

The Church then sued the Government in District Court to challenge the IRS Decision. The Church claimed, first, that the IRS erred in denying the Church's tax-exemption application by failing to recognize that *O Centro* "recognized the use of . . . Ayahuasca in religious ceremonies as a sincere exercise of . . . religion under the First Amendment" and, second, that the Government violated RFRA by "ruling [in the IRS Decision] that [the Church's] activities are illegal[.]" J.A. 26–27. When the parties later filed cross-motions for summary judgment, the Government challenged the Church's standing to raise its RFRA claim. *Iowaska Church of Healing v. United States* ("*Iowaska I*"), 2023 WL 2733774, at *3 (D.D.C. Mar. 31, 2023). To defend its standing, the Church claimed that it had sustained three injuries. First, the Church suffered from the "chilling effect on its religious freedom" occasioned by the IRS's second information request, which it said "caused [the Church] and its members to fear law enforcement intrusion into their ceremonies and potential prosecution under the CSA," J.A. 139–40. Second, it endured "reputational damage" from the IRS Decision's "characterization [of] the Church's activities as 'illegal,'" which the Church said prevented it from conducting other "charitable activities." *Id.* at 140, 141. And finally, it suffered economic injury in the form of lost income and profits, which caused the Church to have "no membership income or contributions with which to carry on its programs for nearly three years." *Id.* at 142.

The District Court granted the Government's motion for summary judgment, concluding that the Church was not eligible for tax-exempt status under Section 501(c)(3) and that it lacked Article III standing to assert its RFRA claim. *Iowaska I*, 2023 WL 2733774, at *3. Starting with the tax-exemption claim, the District Court affirmed that the Church "falls short" of Section 501(c)(3)'s "'organized and operated exclusively' for [an] enumerated public purpose[]" requirement. *Id.* On the "organizational" prong, the District Court interpreted the Church's articles of incorporation to "make explicit the organization's purpose to distribute and facilitate the use of Ayahuasca" and the District Court agreed that purpose was impermissible because the Church "ha[d] not obtained a CSA exemption that would render such ceremonial distribution and use legal." *Id.* at *4. On the "operational" prong, the District Court found that "the bulk of the organization's time is devoted to conducting or preparing for weekend ceremonies in which Ayahuasca is to be distributed to participating members," which, "[a]bsent a CSA exemption . . . amount[s] to the illegal distribution and promotion of the use of a controlled substance"—that is, "a non-exempt purpose." *Id.* The District Court further rejected the Church's reading of *O Centro*. The District Court reasoned that case had no bearing on whether the Church is entitled to tax-exempt status because it "addressed religious Ayahuasca use in an entirely different legal context." *Id.*

Turning next to the RFRA claim, the District Court held that the none of the injuries the Church claimed could support Article III standing. *Id.* at *6; *id.* at *6 n.7. Addressing the Church's claimed "chilling" injury primarily and most extensively, the District Court determined that the fact that "members cannot exercise their sincerely held religious beliefs by consuming Ayahuasca" was "neither traceable to the IRS's denial of [the Church's] application nor redressable with a

favorable ruling[.]" *Id.* at \*6. The District Court reasoned that the Church ceased its Ayahuasca ceremonies because it "lack[ed] . . . a CSA exemption" that would permit use and distribution of Ayahuasca, not because of any action by IRS; the District Court additionally emphasized that the IRS "has no authority to address [the Church's] application for a CSA exemption." *Id.* Moreover, the District Court found the Church's claim that the IRS Decision would "likely put [the Church's] pending DEA religious exemption application at a much higher risk of being denied" was, "at best, speculative" and could not satisfy the traceability requirement. *Id.* at \*7. Finally, the District Court concluded that a favorable decision on the Church's RFRA claim would not redress its alleged "chilling" injury "since granting [the Church] tax-exempt status w[ould] not necessarily lead to DEA's approval of [the Church's] CSA exemption application." *Id.*

The District Court also briefly addressed the Church's claimed reputational and economic injuries, finding that neither injury conferred standing. *Id.* at \*6 n.7. The District Court reasoned, first, that the Church's alleged reputational injury is not sufficiently concrete since the record contains no evidence that the IRS Decision caused any stigmatic harm. *Id.* As to the Church's alleged economic injury, the District Court found that the Church "flunk[ed] the traceability and redressability requirements" because its economic injury depended "entirely on the independent decisions of third-party donors." *Id.*

The Church timely appealed.

## II.

We review the question of whether the Church has Article III standing to raise its RFRA claim *de novo*. *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023); *Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir.

2013). We review the District Court's ruling that the Church is neither organized nor operated exclusively for tax exempt purposes, however, for clear error. *Fund for the Study of Economic Growth & Tax Reform* ("*FSEGTR*") *v. IRS*, 161 F.3d 755, 758 (D.C. Cir. 1998); *see Family Trust of Mass., Inc. v. United States*, 722 F.3d 355, 359 (D.C. Cir. 2013).[2] We conclude that the Church lacks standing to assert its RFRA claim because the economic injury the Church asserts on appeal is neither an injury-in-fact nor redressable and any other standing theories asserted below have been forfeited. Without the specter of a cognizable RFRA claim, the Church's tax-exemption claim also fails; the District Court's affirmance of the IRS Decision was not clearly erroneous given that the Church could not proffer evidence of a CSA exemption to show it passed the organizational and operational tests.

---

[2] The Church argues that the appropriate standard of review for the tax-exemption claim is *de novo* because the District Court ruled on cross-motions for summary judgment. In support, the Church cites two D.C. Circuit cases where this Court specifically gave summary judgment decisions in tax cases *de novo* review—*Byers v. Comm'r*, 740 F.3d 668 (D.C. Cir. 2014), and *Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C. Cir. 2000). Neither of these cases, however, displaces *FSEGTR* as the most applicable case. In *Byers* and *Branch Ministries*, we entertained only clear questions of law. *Byers*, 740 F.3d at 674; *Branch Ministries*, 211 F.3d at 140–41. Here, there is precedent directly on point requiring us to treat "the determination of whether an organization is organized and operated exclusively for exempt purposes [as] a factual determination," which demands review "only for clear error." *FSEGTR*, 161 F.3d at 758. That said, we would be remiss if we failed to reiterate *FSEGTR*'s instruction that "it would be more appropriate for future district courts to decide 501(c)(3) issues at bench trial, rather than on summary judgment." *Id.* at 759.

## A.

On appeal, the Church relies on its economic injury to support its argument that it has standing to assert the RFRA claim, but that injury fails the injury-in-fact and redressability requirements.

"Standing to assert a [RFRA] claim or defense . . . shall be governed by the general rules of standing under [A]rticle III[.]" 42 U.S.C. § 2000bb-1(c). To establish Article III standing, a plaintiff must show (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[;]" (2) "a causal connection between the injury and the conduct complained of," or traceability; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *accord United States v. Texas*, 143 S. Ct. 1964, 1970 (2023). "[S]tanding is not dispensed in gross[;]" plaintiffs "must demonstrate standing for each claim [they] seek[] to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (1996)). Accordingly, the Church cannot use the standing it has to assert its tax-exemption claim to establish standing to assert its RFRA claim.

To allege an injury-in-fact, a plaintiff must have "suffered . . . an invasion of a legally protected interest." *Nat'l Taxpayers Union, Inc. v. United States* ("*NTU*"), 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting *Lujan*, 504 U.S. at 560–61). Organizations, specifically, must show "[s]uch concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests." *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)). Indeed,

a demonstration that "discrete programmatic concerns are being directly and adversely affected" is required. *Id.* (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). The economic injury the Church claims—the loss of the "inherently valuable statutory right" to Section 501(c)(3) tax exemption—is unsupported by any clear assertions about how the economic aspect of that injury has harmed "the organization's activities—with [a] consequent drain on the organization's resources" beyond a simple "setback to the organization's abstract social interests." *NTU*, 68 F.3d at 1433 (quoting *Havens Realty*, 455 U.S. at 379). The Church did clarify before the District Court that the IRS Decision caused the Church "loss of income and profits" and to have "no membership income or contributions with which to carry on its programs for three years," J.A. 142, but even if that is so, those supposed impacts on the Church are too vague to show a "direct[] and adverse[]" impact on any "discrete programmatic concerns." *NTU*, 68 F.3d at 1433 (quoting *Am. Legal Found.*, 808 F.2d at 92).

To the degree that the Church also claims the loss of "charitable contributions and membership income" are part and parcel of its claimed economic injury, Appellant's Br. 44, the Church still fails to show traceability and redressability. Traceability requires "[t]he 'causal connection between the injury and the conduct complained of'" to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at 561). "'When considering any chain of allegations for standing purposes, [this Court] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties),' as well as predictions of future injury that are 'not normally susceptible of labelling as 'true' or 'false.'" *Id.* at 21 (quoting *United Transp. Union v. Interstate Com. Comm'n*,

891 F.2d 908, 913 (D.C. Cir. 1989)). Injuries from any lost "current and future . . . income and profits" are not traceable to the IRS Decision, J.A. 142, but instead, as the District Court explained, "depend[] entirely on the independent decisions of third-party donors," *Iowaska I*, 2023 WL 2733774, at *6 n.7 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)).

The Church relies upon *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014), for its standing argument, but that case is inapposite. There, the Supreme Court determined it was "predictable" that companies that chose to exercise their religious right to refuse insurance coverage for contraception and incur an Affordable Care Act ("ACA") penalty would either have to pay the penalty in addition to paying for employee insurance or "face a competitive disadvantage in retaining and attracting skilled workers" by requiring employees to seek insurance on the ACA exchanges. *Id.* at 722. The Court speculated about the potential third-party actions of workers, however, to determine whether the contraceptive coverage requirement imposed a substantial burden under RFRA, not to assess whether the companies had alleged an injury-in-fact traceable to a defendant's conduct.

The Church also urges that it has standing to assert its RFRA claim based on the chilling and reputational injuries it raised below, but the Church has waived these alleged bases for standing by referencing them only vaguely in a footnote. "A party forfeits an argument by mentioning it only 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'" *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)). An argument left so naked "is tantamount to failing to raise it." *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019). Here, the Church references the

chilling and reputational injuries introduced below in passing but asserts in a footnote it "does not minimize or waive its claim of standing" based on these injuries. Appellant's Br. 45 n.15. However, "[w]e need not consider cursory arguments made only in a footnote." *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc).

**B.**

**1.**

Having held that the Church lacks standing to assert its RFRA claim, we turn to the question of whether the District Court erred in affirming the IRS Decision.

When a taxpayer challenges an IRS denial of tax-exempt status, "the burden is on the taxpayer seeking exemption to demonstrate that it is in fact entitled to tax-exempt status[.]" *FSEGTR*, 161 F.3d at 759. "[E]ntitlement to tax exemption [under Section 501(c)(3)] depends on meeting certain common law standards of charity—namely, that an institution seeking tax-exempt status must serve a public purpose and not be contrary to established public policy." *Bob Jones*, 461 U.S. at 586; *see* Rev. Rul. 71-447, 1971-2 C.B. 230 (same). While "a declaration that a given institution is not 'charitable' should be made only where there can be no doubt that the activity involved is contrary to a fundamental public policy," *Bob Jones*, 461 U.S. at 592, "the presence of a single [non-exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [non-exempt] purposes," *Better Bus. Bureau of Washington, D.C., Inc. v. United States*, 326 U.S. 279, 283 (1945).

The District Court did not clearly err in determining that the Church did not meet its burden here. "[T]he public purpose

of a charitable [organization] may not be illegal or violate established public policy[.]" *Bob Jones*, 461 U.S. at 591; *see also Ould v. Washington Hospital for Foundlings*, 95 U.S. 303, 311 (1878) ("A charitable use, where neither law nor public policy forbids, may be applied to almost any thing that tends to promote the well-doing and well-being of social man."). The Church's primary organizational and operational purpose—Ayahuasca use and ceremony—is illegal on its face without a CSA exemption and the Church did not prove otherwise to either the IRS or the District Court. Indeed, in its initial tax-exemption application, the Church acknowledged that DMT "is illegal absent the appropriate registration with the DEA or pursuant to a judicial or other registration exemption" from the CSA. J.A. 247. The IRS was under the same impression, which is why the IRS both asked the Church about the status of its CSA exemption several times while considering the Church's application and, ultimately, denied the Church's application.

Even though the Church, at some point during the pendency of its application to the IRS, changed its tune and began defending its past and proposed Ayahuasca use as protected under RFRA following *O Centro*, the IRS's interpretation of *O Centro* to mean that "an organization does not have to apply for . . . exemption [from the DEA] prior to seeking relief in the courts," not that applicants can "simply use [Ayahuasca] without the exemption," is correct. *Id.* at 333. *O Centro* established that "the [CSA] do[es] not preclude exceptions [to the use of Schedule I drugs] altogether." *O Centro*, 546 U.S. at 434. The case did not, however, establish the presumptive legality of Ayahuasca use by any purportedly religious group. While "RFRA . . . plainly contemplates that *courts* would recognize exceptions" to the CSA, the statute does not explicitly empower administrative agencies outside of the DEA to make those kinds of exceptions. *Id.* In the absence

of such a decree, a citation to *O Centro* cannot not foist the Church's proposed Ayahuasca use into the realm of legality for the IRS's Section 501(c)(3) assessment purposes without a grant, either directly or through delegation, by Congress. Thus, the IRS was correct in concluding that the Church's Ayahuasca use foreclosed its eligibility for tax-exempt status.

**2.**

The Church counters the preceding reasoning on several grounds, but none of the grounds it provides persuade us to change our holding.

To start, the Church contends that its proposed Ayahuasca use is "presumptively legal" and, thus, cannot serve as a basis for failing the Church on the organizational or operational tests. Appellant's Br. 20. This argument is unconvincing, however, because it conflates the burden the Church would face for an actionable RFRA claim with its burden for the instant tax-exemption claim to obscure the fact that the Church fails to meet the latter.[3] For a RFRA claim, an "effective[] demonstrat[ion] that . . . [a] sincere exercise of religion was substantially burdened" is sufficient to make out a *prima facie* case. *O Centro*, 546 U.S. at 428. Under that framework, a showing that an organization's Ayahuasca ceremonies are a "sincere exercise of religion" could be sufficient to establish the presumptive legality of those ceremonies and shift the burden to the government. For a tax-exemption claim, however, the burden is both different and higher: the taxpayer must show entitlement to tax-exempt status, which, here, puts the onus on the Church to demonstrate that its proposed Ayahuasca use is not "illegal" or "contrary to established

---

[3] In light of our conclusion that the Church lacks standing to assert its RFRA claim, we will not opine on whether it meets its burden for that claim on the merits.

public policy" in the first instance. *Bob Jones*, 461 U.S. at 586; *see FSEGTR*, 161 F.3d at 759. This is why, contrary to what the Church says, it was not the IRS's responsibility to presume the Church's Ayahuasca ceremonies were legal. It was, instead, the Church's job to establish that it had a CSA exemption and it failed to do so.[4]

The Church also relies on *O Centro* to bolster its presumptive legality argument, asserting that, since the Government concedes that the plaintiff's Ayahuasca use in *O Centro* was protected by RFRA, the IRS should have, without court intervention, conceded the same as to the Church's Ayahuasca use. But the Church's conclusion falters because it is premised on a misinterpretation of the precedent. The Supreme Court ruled in favor of the plaintiff in *O Centro*, in part, because the Court deemed the DEA's justification for withholding a CSA exemption for the plaintiff's religious Ayahuasca use—namely, the need for uniform application of the CSA—an insufficiently "compelling government interest" in that context. *See O Centro*, 546 U.S. at 437. Here, as even *O Centro* notes, the IRS Decision and the attendant tax regulatory scheme could be justified by a compelling government interest that necessitates uniform application. *See id.* at 435 (citing the tax exemption cases *United States v. Lee*, 455 U.S. 252, 258 (1982), and *Hernandez v. Comm'r*, 490 U.S. 680, 700 (1989), as examples of where the Court scrutinized an exemption request and determined "the denied [religious] exemptions could not be accommodated" in the face of a

_____

[4] The Church's related argument that RFRA is a both a "*remedial* cause of action" and a "*substantive* restriction[] on the Government" that "sets substantive standards about what conduct the Government can and cannot deem illegal (or otherwise restrict)" fails for the same reason—the Church cannot leapfrog its way to shifting the RFRA burden to the Government when it has not, first, established that it has standing to assert the claim. Appellant's Br. 22.

"compelling interest in uniform application of a particular program"). The difference between the IRS and CSA regulatory schemes is significant enough to render *O Centro* inapposite on this point and in this posture.

The Church's final argument in support of presumptive legality—that "RFRA effectively amended the CSA" to protect Ayahuasca use as a sincere religious exercise—is also plainly wrong. Appellant's Reply Br. 8. "Where there is no clear [congressional] intention otherwise, a specific statute will not be controlled or nullified by a general one." *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974). Here, there is no indication that Congress intended RFRA to amend, control, or nullify the CSA, which is the more specific statute of the two. The IRS's deference to the CSA was, thus, warranted.

The Church next argues that the District Court, in declining to entertain whether the Church had made a sufficient showing to the DEA that it qualified for a CSA exemption, impermissibly introduced an "exhaustion of administrative remedies" requirement. Appellant's Br. 26. This contention relies on a mischaracterization of the District Court's reasoning, however. The District Court merely held, as RFRA provides, that the IRS properly concluded that the Church's Ayahuasca use "remains illegal under federal law" until "[the Church] obtains a CSA exemption." *Iowaska I*, 2023 WL 2733774, at *5. The District Court did not purport to require the Church to pursue an exemption exclusively through the DEA. Instead, it reasonably suggested that the Church had sued the wrong agency, erecting no barrier to the Church pursuing exemption through judicial action with the right party on the other side of the "v."

The precedent the Church cites to further support its administrative exhaustion argument is neither on point nor binding on this Circuit. *Oklevueha Native American Church of*

22

*Hawaii, Inc. v. Holder*, which the Church cites to say that courts "have repeatedly rejected [the] argument" that RFRA permits exhaustion requirements, Appellant's Br. 24, addressed whether a church could obtain a CSA exemption in the courts without first seeking an exemption with the DEA. 676 F.3d 829, 833 (9th Cir. 2012). The Ninth Circuit concluded courts can review "a RFRA-based challenge to the CSA without requiring that the plaintiffs first seek a religious use exemption from the DEA," but did not deny that an exemption in some form is necessary prior to engaging in religious acts that would otherwise be illegal under the CSA. *Id.* at 838.

The Church's remaining arguments that it nevertheless passes the organizational and operational tests are, likewise, in vain. In its brief, the Church leans on the Supreme Court's decision in *Bob Jones* for its announcement that "a declaration that a given institution is not 'charitable' should be made only where there can be no doubt that the activity involved is contrary to a fundamental public policy"—a passage the Church refers to as the "no doubt" rule—to say that the IRS could not have based its decision on the Church's Ayahuasca use because the legality of that use is "uncertain." *Bob Jones*, 461 U.S. at 592. The Church is, again, wrong on this point; while the "no doubt" rule may be sufficient to save an organization committed to unpopular but not illegal activities, it is insufficient to counter the explicitly illegal activity of using and distributing a DMT-rich substance without a CSA exemption. *See Ould*, 95 U.S. at 311.

The Church offers additional explanations for why it passes the organizational and operational tests even if its proposed Ayahuasca use were to be deemed fully illegal, but those explanations, too, are unpersuasive. Addressing the organizational test first, the Church argues its proposed Ayahuasca use in its articles of incorporation is "aspiration[al]"

and does not specify how "'access' will be offered" or "commit to doing so in an illegal manner." Appellant's Br. 39–40. But in pointing this out, the Church ignores that the applicable regulation itself requires the IRS to discern "the organization's purposes . . . by the terms of [the organization's] articles." 26 C.F.R. § 1.501(c)(3)-1(b)(1)(ii). Whether aspirational or not, the Church plainly listed the provision of Ayahuasca in religious ceremony as a purpose and the IRS reasonably incorporated that purpose into its organizational test assessment.

The Church finally contends that the savings clause in its articles of incorporation proves that it does not "expressly empower the organization to engage . . . in [non-exempt] activities." *Id.* § 1-501(c)(3)-1(b)(1)(i)(B). This contention is lacking because the Church forfeited its savings clause argument by failing to raise it before the District Court. *Bernhardt*, 923 F.3d at 179 ("Absent exceptional circumstances, a party forfeits an argument by failing to press it in district court.").[5]

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the District Court as to the Church's tax-exemption claim. Given that the District Court's order granted the Government's motion for summary judgment but did not clearly articulate that the Church's RFRA claim was dismissed for lack of standing, we affirmatively dismiss the Church's RFRA claim here.

---

[5] The Church further argues that it passes the operational test because it has conducted, and continued to conduct, other religious and charitable activities that are unrelated Ayahuasca ceremonies. The Church makes this claim for the first time on appeal, however, so we cannot consider it. *Bernhardt*, 923 F.3d at 179.

24

*So ordered.*